THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JAMES JONES, Defendant-Appellant.

First District (6th Division)   No. 1—87—2550

Opinion filed August 18, 1989.

Randolph N. Stone, Public Defender, of Chicago (Timothy J. Leeming and James H. Reddy, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Bonnie Meyer Sloan, and Peter T. Petrakis, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

The defendant, James Jones, was convicted after a bench trial of intentional murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)), for the shooting death of Leslie Williams and sentenced to a 22-year term of imprisonment. His sole contention is that the evidence failed to establish his guilt beyond a reasonable doubt.

James Jones (James) and his codefendants, Edward Jones (Edward) and Willie Merriweather, were charged by indictment with murder in the shooting death of Leslie "Chuckie" Williams. James and Edward are sons of Merriweather. It was the State's theory that James shot the victim at the behest and encouragement of the two other defendants to avenge the beating the victim had just administered to Merriweather. Edward and Merriweather were found not guilty on the ground enunciated by the trial judge that their accountability in the shooting had not been proved beyond a reasonable doubt.

The State's key witness, Elizabeth Carson, testified as follows: On Friday, May 16, 1986, at approximately 5:30 p.m., she, Williams and several others were playing softball on a vacant lot at 55th Street and Emerald Avenue in Chicago. She had known Williams for nine years and considered him to be a member of the family. She observed Willie

Merriweather walking in an alley adjacent to the lot. Williams grabbed a baseball bat out of her hands, ran up to Merriweather and began striking him with the bat. She told Williams to stop hitting Merriweather and to give her the bat; and he complied. Then two other men, whom Carson later identified as James and Edward Jones, came running down the alley toward the lot. She had seen both of them together around the playground about eight times over the previous month, but she did not know at that time that they were Merriweather's sons. James was wearing a black sweatsuit with red stripes and gym shoes; he had no hat and his hair was braided. She did not get a clear look at Edward's clothes but noticed that he was not wearing a hat either.

As they approached, Merriweather told them "to go and get it." Edward responded, "You want us to go get it?" Merriweather said, "Yes." James and Edward then ran back down the alley. Carson and Williams started walking back to the vacant lot and then headed toward Williams' house across the street. A few moments later Carson saw James and Edward run toward her and Williams. Edward stopped at a tree about 30 feet away from them and told James, "[T]hat's the motherfucker. Get him." James had continued running and was about five feet away when Edward spoke. Carson saw that James had a brown pistol in his hands. She jumped in front of Williams and told James, "Don't do it." James went around her and shot Williams, who fell. As Williams lay face down in the lot, James shot him in the back. She identified all three defendants in court.

Detective Thomas Byron spoke to Carson at her home shortly after the shooting. Although she was coherent and did not appear to be under the influence of drugs or alcohol, Byron was unable to interview her at length because she was so distraught. Carson screamed that she wanted the people who had shot Williams arrested and said that one of them was Merriweather. She provided no other details.

Later that day Carson took an overdose of pills in a suicide attempt. She had attempted suicide once before, in 1982. She had seen a psychiatrist in 1982 and 1984 but was not under care or medication at the time of the shooting.

The next day Detective William Foley and his partner, Detective Cigielski, interviewed her at the hospital and showed her 10 photographs. In Foley's opinion, she seemed rational and coherent. She identified the photographs of Merriweather, James and Edward, and named James as the gunman. She admitted on cross-examination that although she testified that the gunman had his hair in braids, James did not have braids in the photograph. She told the detectives that

Williams struck Merriweather with a bat just prior to the shooting, and that Edward directed James to shoot Williams; but Foley did not put these matters in his report. However, Carson did not tell the police certain other details: that she had seen Edward and James on prior occasions; that Merriweather told Edward and James to "go get it," that Edward told James, "That's the motherfucker"; or that she told James, "Don't do it."

On May 22, after Carson was released from the hospital, she attended a lineup conducted by Byron and identified James and Edward. Merriweather was not in the lineup.

She was reinterviewed by the police and provided more details about the shooting. She stated that she had seen James and Edward before, although she did not provide specifics. She told Byron that Merriweather told Edward and James to "go get it." She also quoted Edward as saying, "That's the boy right there. Get him," rather than, as she testified at trial, "That's the motherfucker right there. Get him." She did not state that Williams grabbed her bat and struck Merriweather with it. She told Byron that after the beating Williams threw the bat away, not that she took it from him.

The parties stipulated that Dr. Choi, an assistant medical examiner, would testify that the deceased was shot twice; once on the left side and once in the back.

Byron and an assistant State's Attorney also interviewed James Jones, who stated that he was with his girlfriend, Lisa Shields, on May 16 at 5:30 p.m. He had stayed at her house the night before. On the day of the shooting he had left the house at about 3 p.m., taking his son to the park. He bought a 40-ounce can of beer at a liquor store, and they remained at the park until about 8 p.m. Afterwards they returned to Lisa's, where he spent the night. He left Lisa's house on Saturday, saw his father and at that time first learned about the beating. Byron talked to Lisa Shields and then spoke with James again. He told James that Lisa did not back his story. James related the same account of his whereabouts on the day of the shooting and said that Lisa must be lying.

It was the defendant's theory that a second person was the gunman. That gunman was identified by Shaheed Bryant, who was eight years old at the time of the shooting. He testified that on May 16 he was playing frisbee with a friend in the vacant lot adjacent to his house at 5521 South Emerald, which was across the street from the ball field. He did not remember seeing Carson on the lot but did see Williams beat Merriweather with a baseball bat. After the beating he saw two persons and a boy with a black gun approach Williams. He

identified the person with the gun by his nickname, "Trouble." "Trouble" was present in court and identified himself as Ira Phillips. (Phillips is another son of Merriweather and the half-brother of James and Edward. James and "Trouble" do not resemble one another; "Trouble" was only 14 years old and considerably thinner than James, who was 20 years old at the time of the shooting.) Shaheed knew "Trouble" and that he was Merriweather's son. He saw "Trouble" shoot Williams from behind. He heard three rapid shots and Williams fell; Williams was not shot again while on the ground. After the shooting, "Trouble" ran toward his house while the other two men ran past the house. He never saw the other men's faces but noticed that they were wearing hats. He then ran into his house and told his mother that "Trouble" shot Williams. He did not remember telling anyone else.

Shaheed was impeached by a prior statement he made on March 31, 1987. At that time he was interviewed by several assistant State's Attorneys and defense attorneys. There was a stipulation that Assistant State's Attorney John Wasilewski would testify that Shaheed stated in that interview that he was having trouble remembering the incident; that Williams did not have a baseball bat when he was shot; that the bat was on the ground three feet away; and that Williams was first shot in the front, then in the back and then again in the front as he lay on the ground. At trial Shaheed explained that he was so nervous during the March interview that he "was just saying anything." He admitted that his statement about the sequence of shots was not true. He stated that he was confused in March but was not confused at the trial and was telling the truth.

Elois Kimble and Cynthia Thomas also testified for the defense. On the night of the shooting they were sitting with Debra Gildart on a porch at 5521 South Emerald, where Thomas lived. Both saw Williams playing softball, and Carson was nearby. Merriweather was walking down the alley when Williams grabbed the bat from Carson and went over to Merriweather and hit him with the bat. Kimble testified that because of the distance, across the street and three doors down, she could see but not hear the blows fall. Thomas, in contrast, testified that the blows were so loud that she had to go into the house to avoid hearing them.

Everything happened very fast according to Kimble, but she remembered four men running through the alley. One had a gun and shot Williams in the back from a distance of about 12 feet. Kimble heard three shots. Williams was still holding the bat as he was shot. Kimble could not describe the gunman or even tell if he was wearing

a hat. She said that the only person close to Williams was Carson, who was looking at Williams as the men approached. After the shooting the men ran back up the alley. She never met Edward or James and could not say whether they or "Trouble" were there.

Thomas testified that she was in the bathroom when she heard the shots and ran to the front porch. At that time Williams was on the ground. She saw men running south toward 56th and Emerald and then cut through an alley. She could not tell if any of the men were James, Edward or "Trouble"; and did not see anyone with a gun, although she noticed that one man had a blue hat with orange trim. After the shooting, Thomas saw Shaheed run into the house and call to his mother, "Mama, they shot Chuckie [Williams], they shot Chuckie."

The State impeached Thomas with a prior statement she gave to Byron in which she stated that she saw Williams beating someone with a bat but could not tell who it was. She was also impeached by a statement she gave to the defense investigator in which she detailed the shooting itself, an event she stated at trial she did not witness. Thomas conceded that the statement she made to the defense was not accurate and explained that she made it to help Edward and James.

Willie Merriweather testified that James and Edward lived with their mother. On the day of the shooting he was talking with two others in the alley near the vacant lot. Williams approached and asked if Merriweather remembered him, and Merriweather said that he did. He and Williams had had a disagreement a few weeks before, but he denied that he threatened Williams. Williams then walked away, got a baseball bat from someone named "O.D." and struck Merriweather with it. Carson stepped up and stopped the attack. Williams began to walk back toward his house, keeping the bat. As Merriweather walked away he heard three shots. He did not see Edward, James or "Trouble" there. He denied owning a gun.

Geraldine Phillips, who lived with Merriweather and was the mother of Ira Phillips, testified that she was at their home from 3:00 p.m. on May 16 and did not see either James or Edward the entire day. Merriweather went out at about 4:30 p.m., and returned about a half hour later with injuries to his arm. She also stated that he kept no weapons in the house.

The testimony of Merriweather and Ms. Phillips that neither James nor Edward was at the house that day and that they did not see either of the brothers was contrary to a statement made by Edward Jones to the police. Byron testified as to statements Edward made to him on May 22. Edward at first claimed that he was with his

girlfriend at the time of the shooting but changed his story when informed that she did not support his alibi. Edward then stated that he had been at his father's house when someone told him that his father was being beaten. In response, Edward left the house, ran to the vacant lot and saw his father and another man who had a baseball bat. That man put the bat down and walked away. Edward approached his father, saw his injured hand and suggested he go to Englewood Hospital. As Edward and Merriweather began to walk back to Merriweather's house, Edward left his father and went to play basketball at a lot north of the shooting scene. While playing ball he saw gang members running down the alley; he then returned to his father's house, got his shirt and took a bus home.

The defendant denied being near the vacant lot on the day of the shooting. He denied seeing his father being beaten, and he denied shooting the victim. He admitted on cross-examination that he told Byron that at the time of the shooting he was at Cornell Park but that was not true; instead he was at his girlfriend's house and remained there all day. He testified that his girlfriend's mother, Catherine Shields, also was present throughout the day and evening. He stated that the reason for the discrepancy between his statement and his testimony was that he was confused as to which day the detective was asking him about. He said that he mistakenly told the detective his whereabouts for Saturday, May 17, rather than Friday, May 16. Neither Catherine nor Lisa testified at trial; Lisa died before trial, but Catherine's absence was not explained.

Byron testified in rebuttal that on May 22 he was very clear with the defendant when he questioned him concerning his whereabouts during the shooting. In fact, Byron asked the defendant what he did on Thursday, the day before, and Saturday, the day after. James told Byron that on Saturday, the day after the shooting, he went to the park and stayed there five hours; and it was that day that he talked to his father about his injured hand. On cross-examination Byron acknowledged that Lisa Shields told him that on May 16 she and James stayed at home the entire day watching television and listening to records, which was consistent with the alibi James offered at trial.

The State also called Ira "Trouble" Phillips in rebuttal, but he invoked his Fifth Amendment right to remain silent.

Following closing arguments the judge found James guilty but found Merriweather and Edward not guilty on the ground that there was reasonable doubt as to their accountability. He expressly found Carson's testimony to be credible, noting that "she was the voice of reason on that empty lot." In his opinion, her prior psychiatric back-

ground and suicide attempt in response to witnessing this traumatic event did not render her a liar or an undependable witness. He also found that she had an excellent opportunity to observe the events. He noted that even defense witnesses Thomas and Kimble put her nearest the scene. Her testimony that she had seen the defendants several times around the neighborhood in the few weeks before the shooting was supported by the testimony of Thomas and Geraldine Phillips. Carson picked the defendants out of a photo array and made a line-up and in-court identification with no hesitation or difficulty. In contrast, the judge specifically found Shaheed to be an unreliable witness and also expressly rejected James' alibi, terming it "weak" and "unreliable."

■ The defendant first asserts that the conviction must be reversed because the State's evidence failed to meet the standard requiring the exclusion of a reasonable hypothesis of innocence. However, the cases cited by the defendant for this proposition involved convictions based solely on circumstantial evidence, whereas in the present case there was direct evidence offered. In addition, the supreme court has held that even in circumstantial evidence cases the State need no longer prove that the facts or circumstances exclude every reasonable theory of innocence. (*People v. Bryant* (1986), 113 Ill. 2d 497, 499 N.E.2d 413.) Therefore, the standard before the reviewing court is whether no rational trier of fact, after viewing all the evidence in the light most favorable to the prosecution, could have found the defendant guilty beyond a reasonable doubt. *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.

■ ■ The sufficiency, weight and credibility of the testimony of eyewitnesses is for the trier of fact to determine. (*People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.) Positive identification by a single witness is sufficient to sustain a conviction, even if there is contradictory alibi testimony, provided the evidence establishes that the witness is credible and viewed the defendant under circumstances that would permit a positive identification to be made. (*People v. Yates* (1983), 98 Ill. 2d 502, 456 N.E.2d 1369.) An identification is considered reliable where a witness had an adequate opportunity to view the assailant, showed an adequate degree of attention, described the assailant with a reasonable degree of accuracy, displayed a sufficient amount of certainty in identifying the accused and made the identification within a reasonable period of time. *People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317; *People v. Williams* (1989), 185 Ill. App. 3d 1040.

■ ■ The testimony of the State's eyewitness, Elizabeth Carson,

meets these requirements. She was within a few feet of the victim and the assailant, points corroborated by the defense witnesses, Kimble and Thomas. Carson had seen the defendant several times in the recent past; and testimony of an identification witness is strengthened to the extent of the prior acquaintance with the accused. (*People v. Reynolds* (1978), 57 Ill. App. 3d 593, 373 N.E.2d 650.) Carson identified the defendant on three separate occasions: in the photo display; at the lineup and at trial. She described the gunman as having braids, and the defendant did not have braids when his picture had been taken. We are unable to tell from the record whether the defendant had braids at the time of his arrest. In the final argument, the defendant's attorney argued that Carson initially did not tell the police that the man who did the shooting had braids. We think it significant that he did not argue that the defendant did not have braids at the time of his arrest. Therefore, we do not view the fact that the defendant did not have braids at the time his identification picture was taken as having any effect on the testimony of Carson that the defendant had braids at the time of the shooting.

In addition, contrary to the defense contention, there was physical corroboration of Carson's testimony. For example, her testimony concerning the sequence of shots was consistent with the stipulated testimony of the assistant medical examiner. She was the only witness who testified that Williams was shot only twice; the others testified to three shots.

●6 It is true that her trial account of what Edwards said to James before the shooting differs somewhat from what she told the police, but not in a significant way. It is also true that Carson did not relate several details concerning the shooting during earlier interviews. However, she was consistent and unwavering on the key elements of the case, namely the identity of the gunman, and any minor discrepancies in her account of the events will not warrant reversal. *People v. Crespo* (1983), 118 Ill. App. 3d 815, 455 N.E.2d 854.

■ Contrary to the defendant's argument, it was not inconsistent for the judge to convict James of murder on the basis of Carson's testimony, yet not convict his two codefendants; and we reject the defendant's assertion that the judge's decision was inconsistent or constituted a finding that Carson was incredible about Merriweather or Edward. Although he did not expand upon his reasoning on this portion of his ruling, we find it logical that he believed Carson, yet concluded nonetheless that her testimony and the other evidence were inadequate to convict.

As the defense argues, there is some evidence, the testimony of

Shaheed, that "Trouble" was the gunman. But the trial judge heard and saw Shaheed. It was his province to determine Shaheed's credibility and the weight to be given his testimony. It is not for us to substitute our judgment for his.

██ The same observation must be made about the defendant's argument that he had established an alibi. The defendant gave conflicting accounts of his whereabouts at the time of the shooting. He also failed to produce an alibi witness, Catherine Shields, or to explain her absence. Although the failure to substantiate an alibi may not be used as proof of the charge (*People v. Kubat* (1983), 94 Ill. 2d 437, 447 N.E.2d 247), it may be considered in determining the credibility of the defendant and the validity of his purported alibi.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and QUINLAN, JJ., concur.