THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES YOUNG, Defendant-Appellant.

First District (5th Division) No. 1—86—1017

Opinion filed November 30, 1990.—Rehearing denied January 11, 1991.

Michael J. Pelletier and Debra R. Salinger, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Andrew LeFevour, and Gael O'Brien, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

After a jury trial, defendant, Charles Young, was convicted of the gang-related murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(1)) of Robert Morrison and sentenced to 32 years in prison. On appeal, he contends that: (1) his inculpatory statements should have been suppressed as fruit of his illegal arrest; (2) his inculpatory statements should have been suppressed because they were involuntary; (3) his conviction should be reversed because, without his statements being in evidence, the State failed to prove him guilty of murder beyond a reasonable doubt; (4) the trial court improperly limited his cross-examination of several of the State's witnesses; (5) the trial court improperly permitted a photograph of the victim, his mother and an unidentified friend to be viewed by the jury during its deliberations; (6) the State made improper, prejudicial remarks during closing argument; and (7) the trial court should have modified his sentence to reflect a full credit against a Violent Crime Victims Assistance Act (Ill. Rev. Stat. 1985, ch. 70, par. 501 *et seq.*) fine because of his pretrial incarceration time. The State has conceded that the trial court should have modified defendant's sentence to reflect a full credit against the Violent Crime Victims Assistance Act fine and therefore we need not consider that issue. For the reasons set forth in this opinion, we vacate the judgment and remand this matter to the trial court for additional proceedings.

FACTS

A. DEFENDANT'S MOTION TO QUASH ARREST AND SUPPRESS EVIDENCE

Though defendant's first motion was titled "Motion to Quash Arrest and Suppress Evidence," it is clear from the record that the hearing conducted on that motion was limited to matters pertaining to the existence of probable cause for the arrest. At the hearing, defendant testified that when he left his apartment at 1159 North Larrabee in Chicago on July 29, 1984, he walked up to two police officers who were sitting in an unmarked police car, introduced himself, and told them that he had heard that they wanted to see him. The

officers responded affirmatively and ordered him to get into the back seat of their car alongside another individual already seated there. Defendant testified that he was then driven to the police station at Belmont and Western and there placed alone in an interview room where he was handcuffed to the wall. He was told by a police officer that he was under arrest for murder. Defendant testified that he remained handcuffed to the wall in this room overnight, aside from one instance when he was released and taken to the lavatory.

Officer Lloyd Reid, who was assigned to the public housing unit of the Chicago police department, testified that on July 29, 1984, he received an assignment to pick up four individuals for questioning on a murder which had occurred earlier in the day at 1161 North Larrabee. He stated that at approximately 10 p.m. on that day, he and his partner, Officer Robert Bradford, went to 1159 North Larrabee, where they were approached by defendant, one of the individuals they were seeking. Reid did not then question defendant about the murder but told him that he wished to take him to the police station for questioning as a witness. He specifically advised the defendant that he was not under arrest. After defendant consented to accompany them, Reid first conducted a "pat-down" search for weapons and, when he found none, told defendant to get into the backseat of the unlocked police car. They then drove him to the police station at Belmont and Western. When they arrived, they placed him in a separate interview room on the second floor of the stationhouse.

Officer Anthony Villardita, who was assigned to the violent crimes unit of the Chicago police department, testified that on July 29, 1984, he, too, was dispatched in a separate car to 1159 North Larrabee to pick up defendant for questioning regarding the murder of Robert Morrison. When he arrived there at about 10 p.m., he spoke with defendant and told him that the police had information that he and his friends were in the area at the time of a murder. He could not recall any officer telling defendant that he was under no compulsion to go with them to the station nor could he recall extending an option to the defendant to come to the station voluntarily. He confirmed that defendant was placed in an interview room at the station but denied that defendant was handcuffed to the wall. He personally conducted an interview of defendant in that room, without first giving *Miranda* warnings, but did not state what information was obtained from defendant at that time. Officer Villardita stated that he went off duty at 12:30 a.m. on July 30.

Detective Raymond Komenski testified that he worked the 12:30 to 8:30 a.m. shift at the Belmont and Western police station on July

30, 1984. During this shift, he once opened the door to the interview room where defendant had been placed and told him that they would get to him as soon as possible. He stated that, on this one occasion, the door to defendant's room was closed but not locked and defendant was not handcuffed. This visit lasted approximately 10 seconds. Detective Komenski had no further opportunity to speak with or observe defendant during his shift because there was a manpower shortage and he was assigned to another job. He also stated that neither he nor anyone else to his knowledge ever told defendant that he was free to leave the stationhouse.

Officer Paul Carroll, who began his shift at the Belmont and Western police station at 8:30 a.m. on July 30, 1984, testified that at approximately 10:15 or 10:30 that morning, he spoke with Julius Perkins, a witness to the murder of Robert Morrison. In that conversation, Perkins repudiated a previous statement to the police that he could not identify the victim's shooter. Perkins stated that in fact he saw defendant, whom he knew from the neighborhood, shoot Morrison and that he also saw two other individuals, Stanley Rankins and Earl Jones, nearby at the time. He explained that he lied in his earlier statement because he knew the three individuals were gang members and was frightened of them. Officer Carroll stated that after this conversation, he considered defendant to be under arrest and locked the door to his room. However, he did not so inform the defendant until sometime that afternoon. Thereafter, Carroll left the station and proceeded to investigate the other individuals named by Perkins. Carroll did not return to the stationhouse to speak to defendant until about 2 p.m.

It was stipulated that while defendant was at the police station, he made a court-reported confession, the substance of which was later presented at the separate hearing on his motion to suppress statements.

After hearing arguments on the motion to quash defendant's arrest, the trial judge denied the motion, finding only that: (1) defendant was placed under arrest at approximately 10:30 a.m. on July 30, 1984, after Carroll's conversation with Perkins, (2) probable cause existed for that arrest, and (3) prior to the time of that arrest, "a reasonable, innocent person in the defendant's situation would not have necessarily considered himself under arrest."

B. DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

The issue raised at the hearing on defendant's second motion, designated as a "Motion to Suppress Statements," pertained to defend-

ant's assertion that his statements were involuntary. In that motion, defendant did not challenge the admissibility of the statements as the fruit of an unlawful arrest since that arrest had been determined to be lawful by the trial court when it heard defendant's earlier motion. At the hearing, Officer Paul Carroll testified that he had learned that defendant had remained in the second-floor interview room from the time he came into the stationhouse on July 29. He described that room as being a windowless, 10- by 18-foot room with no telephone or washing facilities. He stated that he "knew" that defendant was fed sometime between noon on July 30 and 3:15 a.m. on July 31 and that he escorted defendant to the lavatory at about 1 p.m. on July 30. He further stated that he gave defendant cigarettes throughout the day. Detective Anthony Graffeo testified that either he or Carroll fed defendant at about 2 or 3 p.m. on July 30 and that he took defendant to the lavatory at about 2 p.m. on that day. At approximately 2 p.m. on July 30, Carroll and Graffeo first gave defendant his *Miranda* warnings and questioned him for about 20 minutes in the interview room concerning the shooting. Within the first five minutes of their examination, defendant implicated himself as the person who shot Robert Morrison. Both Carroll and Graffeo denied slapping or threatening defendant during this examination. At the conclusion of this examination, they left defendant in the interview room.

At about 6 p.m. on July 30, Carroll and Graffeo took defendant to a police station at 11th and State for a lie detector test and, after giving defendant his *Miranda* warnings, again spoke to defendant for about 20 minutes regarding the incident. Neither Carroll nor Graffeo stated what he learned from this interview. Again, both Carroll and Graffeo denied slapping or threatening defendant during that interview. Afterwards, they returned defendant to the Belmont and Western station, where they again placed him in the interview room, and Carroll then prepared an arrest report on defendant.

Assistant State's Attorney George Velcich testified that at about 8:20 p.m. on July 30, 1984, after first giving defendant his *Miranda* warnings, he interviewed him for about 15 minutes regarding "the incident" in the presence of Officer Carroll. He stated that sometime after this interview, he offered food and the use of the lavatory and a telephone to defendant. At 10:45 p.m., after again giving *Miranda* warnings, he again interviewed defendant. Velcich did not provide any details concerning these interviews in his direct examination nor was he asked to do so on cross-examination.

At 12:40 a.m. on July 31, after Velcich again gave defendant his *Miranda* warnings, defendant made a court-reported confession of the

murder. At 3:25 a.m., after the confession had been transcribed, Velcich tape recorded his reading of the confession to defendant, who then signed the confession. In his confession, defendant acknowledged that he was a member of the Black Gangster Disciples street gang and admitted shooting and killing Robert Morrison at 1161 North Larrabee on July 29, 1984. He further stated that he had been ordered by Stanley Rankins, a captain in the Black Gangster Disciples, to kill Morrison, allegedly a member of the rival Cobra Stones street gang, and that Earl Jones, also a member of the Black Gangster Disciples, served as a lookout during the shooting. He also acknowledged that he had not been mistreated by the police during the time he was at the police station.

Defendant, whose testimony disclosed that he was 21 years old, had a learning disability, and could not read or write, testified that after being handcuffed in the second-floor interview room at Belmont and Western he was never offered any food or sleeping accommodations or allowed to use any bathroom facilities. Nor was he permitted to make any telephone calls. He further stated that the police frequently hit and threatened him while questioning him in the room. He said that he finally agreed to confess to the murder only after Officer Carroll first told him what to say and threatened that, if he did not confess as instructed, he would be beaten and dropped off in the territory of the rival Cobra Stones street gang.

Yvette Griffin, defendant's girl friend, testified that she twice telephoned the front desk of the police station at Belmont and Western during the evening on July 29, asking to speak to defendant, but was told that he was not there. Thereafter, she did not again telephone the station. Juanita Young, defendant's mother, also testified that she telephoned that station in the evening on July 30, asking to speak with her son, but was told that she could not then speak with him. She did not again call the station until the following afternoon.

After hearing arguments on defendant's motion to suppress his statements, the trial judge denied the motion, finding that defendant's statements were voluntarily given.

## C. TRIAL

At trial, Julius Perkins testified that at about 1 a.m. on July 29, he left his apartment on the fifth floor of 1161 North Larrabee to carry laundry downstairs to his father's car. As he descended the staircase, he saw and greeted Earl Jones, who refused to return the greeting. Perkins continued down the stairs, and when he arrived on the fourth-floor landing, he saw Stanley Rankins trying to hide a gun

and heard him saying, "I'm going to kill this m----- f-----." Perkins then continued down the stairs and next saw Robert Morrison climbing the stairs with a yellow bicycle in his hands. After greeting Morrison, he proceeded down the stairs and Morrison proceeded up the stairs. When Perkins arrived at the third-floor landing, he stopped to tie his shoes and then heard a bicycle falling from above. When he looked up at the fourth-floor landing, he saw defendant and Morrison standing on the landing, with defendant pointing and firing the same gun he had earlier seen in Rankins' hand at Morrison. After defendant shot Morrison, Perkins first fell to the ground and then quickly got to his feet and descended the staircase. When he arrived in the lobby, he heard two more shots coming from the staircase.

On cross-examination, Perkins denied telling the police immediately after the shooting that Morrison was the only person he had seen as he was descending the staircase. He did admit, however, that he told two friends that he never saw the shooting. He further admitted that he had two prior felony convictions.

Officer Philip Mannion testified for the State that at about 1:15 a.m. on July 29, he saw Morrison's body with two gunshot wounds on the fifth-floor rampway at 1161 North Larrabee. He further testified that while there, he spoke with Perkins, who told him that he heard three shots when he arrived at the first floor but did not see the shooting or anyone leaving the stairwell at the time.

Yuksel Konakci, an expert in forensic pathology, testified for the State that Robert Morrison died as a result of multiple bullet wounds. He stated that the bullets entered the victim's back below his right shoulder blade and exited the front of his body above either the left or right breast areas. Though Konakci stated that he could tell that the bullets travelled upwards in the body, he could not tell from the bullets' paths whether the gun which fired the shots was pointed in an upward direction. He did state, however, that a bullet's path "maybe" could be altered by contact with a body's ribs. On cross-examination, he was asked whether the trajectory of the bullets could indicate that the gun was pointed upward, but the trial judge sustained the State's objection to the question. The defendant, however, later called Officer Frank Kajari as a witness, and he testified that Konakci told him during his investigation that the trajectory of the bullets indicated that the gun was fired upward at the victim.

Assistant State's Attorney Velcich testified about his conversations with defendant on July 30-31, 1984. He reiterated the testimony he gave at the hearing on defendant's motion to suppress statements and added that after his 8:20 p.m. conversation with defendant,

defendant agreed to repeat his statement to a court reporter. He further added that during the 10:45 p.m. conversation, he asked defendant how he had been treated at the police station and asked him if he wanted any food or drink or wanted to use the lavatory. The State introduced defendant's written confession and the tape-recorded reading of that confession to defendant through Velcich.

The defendant denied the shooting and presented an alibi defense that he had been out with his girl friend during the evening of July 28, 1984, returned to his apartment at 1159 North Larrabee at about 12:35 a.m. on July 29 and fell asleep on the couch. He testified that he did not awake until approximately 7 a.m. When he later left the apartment, he walked up to a parked police car because he had heard the police wanted to talk with him. He stated that he was then taken to the police station for questioning against his will. He further stated that, when he was initially questioned at the station, he told the police that he did not shoot Morrison but instead was home asleep when the shooting occurred.

After argument, the jury returned its verdict, finding defendant guilty of the murder of Robert Morrison.

OPINION

I

On appeal, defendant contends that the various statements that he gave to the police and to Assistant State's Attorney Velcich should have been suppressed as fruit of an illegal arrest. He argues that he was in fact placed "under arrest" during the night of July 29 when he was first taken to the police station. He contends that no probable cause existed when the arrest occurred and that all statements made by him thereafter were resultantly tainted by this illegal arrest. Though the State concedes that the police did not have probable cause to arrest defendant until approximately 10:30 a.m. on July 30, 1984, when Julius Perkins identified defendant as the person who shot Robert Morrison, it argues that defendant was not under arrest prior to that time but that he voluntarily agreed to accompany the police to the station and to wait for questioning. It further argues that even if defendant were illegally arrested prior to that time, his statements were admissible because of certain attenuating factors which broke the causal connection between the arrest and the statements.

■ Before addressing defendant's contention that his statements were tainted, we first need to determine whether defendant was illegally arrested. The relevant inquiry on this issue is whether, prior to

the time that Perkins made his identification, "the circumstances [were] such that a reasonable man would conclude that he was not free to leave." (*People v. Wright* (1985), 111 Ill. 2d 128, 145, 490 N.E.2d 640, 645.) If a reasonable person would have arrived at such a conclusion, then the detention, for which there admittedly was no probable cause, was unlawful. (*People v. Hardway* (1987), 163 Ill. App. 3d 596, 516 N.E.2d 830.) In reviewing the circumstances in the present case, we will consider as true only the testimony of the police officers, except where defendant's testimony was unrebutted, so as not to substitute our judgment for that of the trial court on issues of credibility. See *People v. Dowdell* (1980), 81 Ill. App. 3d 266, 268, 401 N.E.2d 295, 296.

■ Upon review of all the circumstances preceding the conversation with Perkins, we find that cumulatively they were such that a reasonable person would have concluded that he or she was not free to leave. We consider most significant the events which transpired after defendant was taken by the police to the police station at Belmont and Western. When brought there, defendant was not asked to wait in the public waiting area, where one might expect a person who voluntarily comes to a police station for questioning to be placed. Instead, he was immediately taken to the second floor of the station and segregated in a 10- by 18-foot windowless interview room, containing no washing or sleeping facilities and no telephone, with the door closed. There, he was questioned by Officer Villardita. After the questioning, he was not released or ever told that he was free to leave even though, once so questioned, the police had ostensibly accomplished their articulated purpose for bringing defendant to the police station.

Even though defendant had not implicated himself in the murder during the questioning session with Villardita, a fact which is implicit in the State's concession that the police lacked probable cause to arrest him at this point, the police left him to spend the entire night in the closed, small interview room, which, as indicated, contained no sleeping facilities, without ever first informing him that he was free to go or even inquiring whether he would prefer to go home to sleep in his own bed and then return to the station if necessary. The State admitted that defendant remained in this small interview room for more than 12 hours before any probable cause for his detention was obtained. (*Cf. People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 425 N.E.2d 1046 (where reviewing court rejected notion that defendant freely chose to remain in police station for approximately nine hours).) Moreover, defendant's testimony that he was continuously denied re-

quests to make a telephone call while in the room was never specifically rebutted by any testimony offered by the State. It defies credibility for a detainee under such severe and extended circumstances to believe that his acquiescence to such treatment was left to his voluntary discretion. Furthermore, there is nothing in the record to show that, after the initial interview with Villardita up until the police obtained probable cause at 10:30 a.m. on July 30, anything was done to expedite whatever questioning was to be performed. In fact, there was only one brief visit by Officer Komenski during this period, lasting but 10 seconds. We find that under such circumstances a reasonable person would conclude that he or she was not free to leave. See generally *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.

The State's argument that defendant voluntarily accompanied the police to the stationhouse and agreed to wait for questioning is unpersuasive. Though defendant initiated contact with the police when he voluntarily approached them on July 29, 1984, and "consented" to accompany them to the police station, we do not view these actions as dispositive of the voluntary nature of his acts in light of the fact that the idea to go to the station first originated with the police. (See *People v. Gordon* (1990), 198 Ill. App. 3d 791, 797, 556 N.E.2d 573, 577.) Furthermore, the fact that a defendant initially accedes to a police request to accompany them to the police station does not legitimize the treatment of defendant after he arrived at the station. (*Cf. People v. Fitzpatrick* (1982), 107 Ill. App. 3d 876, 879-80, 438 N.E.2d 222, 224 (fact that defendant acceded to a police request to accompany them to police station not considered significant in light of totality of circumstances indicating arrest).) Additionally, the argument that defendant was voluntarily at the station for questioning as a "witness" is unsupported by the record. From the time defendant was first brought to the police station late on July 29 until 2 p.m. the next day, a full 16 hours later, he was briefly questioned only by Officer Villardita shortly after he was brought into the station. If mere questioning was the goal, he would not then have been ignored and left to spend the entire night in a small, windowless room, lacking in basic facilities, with the door closed. There is no indication that defendant ever was told he was free to leave that small interview room that night. Instead, as in *People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 372, 425 N.E.2d 1046, 1048, the State impliedly asks us to believe that defendant voluntarily chose to spend a lengthy time period in an interrogation room at the police station. As in *Sturdivant*, we reject such a notion.

Officer Komenski did testify that the reason he could not question defendant during his shift was the existence of a manpower shortage, but, even so, the State failed to provide any adequate explanation why under such circumstances defendant was not given the option to go home, sleep in his own bed, and come back when there would be someone available to talk to him. The circumstances of this case from the time defendant was brought into the station strongly suggest that he was not at the station voluntarily to answer witness questions but instead was being held against his will and was not free to leave.

The circumstances presented by this case are similar to those present in our recent decision in *People v. Gordon* (1990), 198 Ill. App. 3d 791, 556 N.E.2d 573. The defendant in *Gordon* was initially questioned by police at his apartment concerning the whereabouts of a suspect in a murder. After defendant denied any knowledge, the police "requested" his presence at the police station for further questioning and defendant agreed to accompany them. The police then drove him to the police station, where he was placed in a small interview room and questioned again about the suspect and his whereabouts. Though defendant continued to deny knowledge and further did not provide any information which would implicate himself in the crime, he remained in the interview room overnight, without being permitted to make a telephone call or to communicate with anyone. According to police testimony, defendant agreed to remain overnight in the interview room, sleeping on chairs, because he wanted to insure his sobriety for a polygraph test which he agreed to take on the following day. He remained in the station house for 12 hours before being transported by police to the polygraph examiner's office. During the trip, he implicated himself in the crime. In finding that under these circumstances defendant effectively was under arrest, we noted:

> "Even ignoring the absurd notion that an individual would rather sleep in the interview room of a police station than at home in his own bed to insure his sobriety for an examination he was under no legal obligation to submit to, we believe the record belies the contention defendant was not, at least by that time, considered a possible suspect. At a minimum, the record indicates an effort to compel defendant to disclose information the police believed he was privy to about [a codefendant] which defendant was, for one reason or another, unwilling to share. In either case, we find the conduct of the police toward defendant in conflict with the protections afforded him by the fourth amendment." *Gordon*, 198 Ill. App. 3d at 798, 556 N.E.2d at 577-78.

Like the defendant in *Gordon,* defendant in the present case was driven by the police to the stationhouse at their request for "questioning," was placed in an interview room where he initially was questioned but did not implicate himself, and then remained overnight in that room, without being extended the use of a telephone, for a lengthy period of approximately 12 hours, before the police obtained information adequate to provide probable cause for his arrest. Additionally, and even more egregiously, unlike the facts in *Gordon,* there is no testimony in this case that defendant explicitly agreed to remain in that room overnight or that he had any articulated reason for doing so. Under these circumstances, we do not hesitate to find that defendant was being unlawfully detained.

■■ ■ Having determined that defendant's arrest was illegal, we next address his contention that all statements made by him after this illegal arrest should be suppressed because the statements were the fruit of that arrest. The fact that an arrest is illegal does not mean that all statements made thereafter are *per se* excludable. (*People v. Lekas* (1987), 155 Ill. App. 3d 391, 411, 508 N.E.2d 221, 235.) The determining question in our analysis of this issue is whether defendant's statements were obtained as a result of the exploitation of his illegal arrest or obtained *by means sufficiently distinguishable* to be cleansed of the original taint. In *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, the United States Supreme Court noted that this question "must be answered on the facts of each case." (422 U.S. at 603, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261.) As an aid to answering that question, the Court set forth several significant factors, including: (1) the presence of *Miranda* warnings; (2) the temporal proximity of the arrest and the statement; (3) the presence of any intervening circumstances to break the causal connection between the arrest and the statement; and (4) the purpose and flagrancy of the official misconduct. (422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62.) Defendant argues that the absence of any intervening circumstances to break the causal connection between his arrest and statements as well as the purpose and flagrancy of the police misconduct would mandate suppression of his statements. The State argues that even if the arrest is deemed illegal, the taint of its illegality was attenuated by intervening factors which broke the causal link between the arrest and the statements.

■■ Because of the nature of the proceedings below, we are unable to resolve the question of attenuation under the present state of the trial court record. As indicated, in conducting the hearing on defendant's motion to quash arrest and suppress evidence, once the

trial court concluded that defendant's arrest was legal, it then became unnecessary for it to hear evidence to determine whether his statements were tainted as the fruit of an illegal arrest. As a result, the trial court neither heard evidence nor made any findings as to whether there were any attenuating factors breaking the causal link between the arrest and the statements. Likewise, when the trial court conducted a separate hearing on defendant's second motion, the motion to suppress statements, the issues were confined to voluntariness and did not raise the question whether the statements were tainted as fruit of an illegal arrest since that issue had been mooted when the court found that defendant was never illegally arrested.

At the hearings that have been conducted in this case, some evidence has been presented which relates to several of the factors which *Brown v. Illinois* considered to be important in determining whether a defendant's statement has been obtained by exploitation of the unlawful arrest. Evidence has been presented relating to the length of time between defendant's "arrest" and statements, the presence of *Miranda* warnings, and the purpose and flagrancy of the police conduct. However, the trial court made no specific findings as to the adequacy of any of this evidence on the question of attenuation.

Additionally, the record is devoid of any evidence as to whether defendant was ever confronted with the information Perkins provided to Officer Carroll prior to the 2 p.m. interview on July 30. Evidence as to whether defendant was confronted with this new information would be significant to the question of whether any of his statements were free of the taint of his unlawful arrest in that it may well constitute an intervening circumstance to break the causal connection between the arrest and the statement. In *People v. Lekas* (1987), 155 Ill. App. 3d 391, 508 N.E.2d 221, a case similar in many respects to the present case, we found that statements given by a defendant after he was confronted with new information discovered while he was in custody "were purged of any taint of any possible illegality in his arrest." (155 Ill. App. 3d at 414, 508 N.E.2d at 237; see also *People v. Foskey* (1990), 136 Ill. 2d 66, 88, 554 N.E.2d 192, 203 (where an inculpatory statement made by defendant after being confronted with legally seized drugs was found to be free of the taint of his illegal arrest).) This evidence has added significance for "where intervening circumstances are present, a long period between arrest and confession [as may be present in the instant case] may support the inference that it was the intervening circumstance, and not the illegal arrest, which prompted the confession." (*People v. White* (1987), 117 Ill. 2d 194, 224, 512 N.E.2d 677, 688.) Because of the potential importance

of this evidence, we deem testimony on this subject to be necessary for determining whether defendant's statements were free of the taint of his unlawful arrest.

■ Defendant also contends that his inculpatory statements should have been suppressed, after the hearing on his motion to suppress statements, because they were involuntarily given. This issue is distinct from the issue raised by defendant's request for suppression as fruit of an illegal arrest. (See *Brown v. Illinois* (1975), 422 U.S. 590, 600-02, 45 L. Ed. 2d 416, 425-26, 95 S. Ct. 2254, 2260-61; *People v. Lekas* (1987), 155 Ill. App. 3d 391, 411, 508 N.E.2d 221, 235.) In *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, the United States Supreme Court explained this distinction as follows:

> "Frequently, as here, rights under the two Amendments [fourth and fifth amendments] may appear to coalesce since 'the "unreasonable searches and seizures" condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment.' [Citations.] The exclusionary rule, however, when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth. \*\*\*
>
> Thus, even if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.' [Citation.]" (422 U.S. at 601-02, 45 L. Ed. 2d at 425-26, 95 S. Ct. at 2260-61.)

The voluntariness standard under the fifth amendment is satisfied if it is determined that the statements were not induced by coercion or promises of leniency. (See *People v. Lekas* (1987), 155 Ill. App. 3d 391, 411, 508 N.E.2d 221, 235.) The fourth amendment concerns, however, look beyond this conventional voluntariness to determine whether the statements were " 'come at by exploitation of \*\*\* illegality or instead *by means sufficiently distinguishable* to be purged of the primary taint.' [Citation.]" (Emphasis added.) *Wong Sun v. United States* (1963), 371 U.S. 471, 488, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417.

■ A confession is voluntarily given if, after considering all the circumstances in the record, it can be said that it was made freely

and without compulsion. (*People v. Hunley* (1989), 189 Ill. App. 3d 24, 37, 545 N.E.2d 188, 197.) A trial court's finding that a defendant's confession is voluntary will not be overturned on review absent a showing that it is against the manifest weight of the evidence. (*People v. Stachelek* (1986), 145 Ill. App. 3d 391, 401, 495 N.E.2d 984, 990.) Defendant argues that the oral inculpatory statements which he gave at 2, 6, 8:20 and 10:45 p.m. on July 30 and the court-reported inculpatory statement which he made at 12:45 a.m. on July 31, which was later reduced to writing, were all involuntary. After reviewing the circumstances surrounding these statements, we find that the court's determination of voluntariness was not against the manifest weight of the evidence.

■ There was evidence that *Miranda* warnings preceded each of the statements and that the various interview sessions were relatively brief, sufficiently separated in time from each other and did not involve any threats or coercion. There was also evidence that defendant was fed and allowed the use of the stationhouse lavatory facilities before giving his statements. Moreover, defendant's confession includes his assertion that he had not been mistreated during his time at the police station. Though defendant remained in the small, bare, windowless room for most of the time when he was giving statements, that fact alone does not make his statements involuntary. As we noted in *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 495 N.E.2d 984, the fact that a defendant remained in a bare interview room for a lengthy period of time "fails to indicate the existence of a coercive element in the circumstances surrounding the confessions." 145 Ill. App. 3d at 402, 495 N.E.2d at 991.

Defendant argues that his statements were involuntary because he lacked an adequate mental capacity to voluntarily confess to the crimes. Though there was testimony that defendant had a learning disability and could not read or write, the record does not support the conclusion that these factors affected the voluntariness of the statements. The record does not suggest that defendant was incompetent because of this learning disability nor does it show that this disability made defendant susceptible to coercion. Additionally, there is no evidence that defendant's inability to read and write was used to compel his confession. As supported by a tape recording which was introduced into evidence, Assistant State's Attorney Velcich first read the transcribed copy of the confession to defendant and then made sure that defendant understood and agreed with the confession before he signed it.

Defendant also argues that his statements were involuntary be-

cause the police deliberately isolated him from family and friends until he gave his statements. Though there is testimony that defendant's girl friend telephoned the front desk of the police station twice in the evening on July 29 and was told that defendant was not there and his mother telephoned the station once in the evening on July 30 and was told that she could not then speak to defendant, we do not find that their inability to get through to him on these limited occasions demonstrates an isolation from them which would pressure this 21-year-old defendant into giving statements at the various times on July 30 and 31. Moreover, isolation alone without evidence of other coercive manipulation is insufficient to vitiate his statements as involuntary. (See *People v. Stachelek*, 145 Ill. App. 3d 391, 401-02, 495 N.E.2d 984, 991.) As indicated, there was sufficient evidence to support the conclusion of the trial court that there was no coercion.

■ Accordingly, we cannot say that a determination of voluntariness under the scope of the fifth amendment is against the manifest weight of the evidence. But, as we previously indicated, this is not dispositive of the broader question under the fourth amendment as to whether the statements are the fruit of defendant's unlawful arrest. That question can only be clarified by a further hearing on remand. (*Cf. People v. Williams* (1985), 130 Ill. App. 3d 758, 474 N.E.2d 1330 (remanded for hearing solely on issue of voluntariness of consent to search).) We therefore direct the trial court to conduct additional proceedings consistent with this opinion.

■ If, upon rehearing, the court should find no attenuating factors and, as a result, suppresses the statements, then a new trial will be required. Contrary to defendant's argument, an outright reversal would not be warranted because, even absent these statements, there was sufficient remaining evidence for the jury to conclude that defendant was guilty beyond a reasonable doubt. (See *People v. Hardway* (1987), 163 Ill. App. 3d 596, 516 N.E.2d 830.) Even without the statements, there still remains the eyewitness testimony of Julius Perkins that he saw defendant, a person whom he knew from the neighborhood, point and fire a gun at Robert Morrison on the staircase at 1161 North Larrabee shortly before Officer Mannion found Morrison's body with two gunshot wounds on that staircase. The positive testimony of one eyewitness is sufficient to convict a defendant of murder. (*People v. Jones* (1989), 187 Ill. App. 3d 823, 830, 543 N.E.2d 834, 839.) Though there was some testimony by Perkins on cross-examination and by Officer Mannion that seemingly contradicted Perkins' direct testimony, the apparent contradiction was for the jury to evaluate and assess in making its determination as to credibility.

(See *Jones*, 187 Ill. App. 3d at 830, 543 N.E.2d at 839.) A reviewing court will not substitute its judgment for that of a jury which heard all of the evidence. See *People v. Hardway* (1987), 163 Ill. App. 3d 596, 601, 516 N.E.2d 830, 833.

## II

Defendant next urges as grounds for a new trial that the trial court erred in making certain evidentiary rulings and in permitting improper prosecutorial comment.

Defendant first contends that he was deprived of his constitutional right to confront an adverse witness (Ill. Const. 1970, art. I, §8) when the trial court ruled on a motion *in limine* that he could not question Julius Perkins, the State's eyewitness, about a subsequent battery charge brought against him. That charge was stricken with leave to reinstate prior to his testifying at trial. The trial court held that the stricken charge was not a proper subject of cross-examination unless the defendant would first establish that the State made some promise to strike the charge in return for his testimony on the murder.

■■■ Though a trial court generally has discretion to determine the scope of cross-examination, a party should be permitted a wide latitude to explore the interest, bias or motive of a witness to testify falsely. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §607.7, at 359-60 (5th ed. 1990).) The fact that a witness has been charged with a crime may be inquired into on cross-examination if it reasonably tends to show that the witness' testimony has been influenced by interest, bias or motive to testify falsely. (*People v. Barr* (1972), 51 Ill. 2d 50, 51, 280 N.E.2d 708, 710.) A defendant need not first show that the State has made some promise to strike the charge in return for testimony before cross-examining a witness regarding the charge. See *People v. Harris* (1988), 123 Ill. 2d 113, 147, 526 N.E.2d 335, 349.

■■■ We find that the trial court did improperly restrict defendant's cross-examination of Perkins by not permitting him to question Perkins about his battery charge and the disposition of that charge. A similar question was considered in *People v. Reese* (1984), 121 Ill. App. 3d 977, 460 N.E.2d 446, where a defendant was precluded from cross-examining one of the victims of a crime regarding criminal charges which were filed against that witness before the date of the crime for which defendant was charged and later stricken with leave to reinstate. There, the court ruled that this limitation of cross-examination constituted a deprivation of the right to confront witnesses and noted:

"We think the jury was entitled to know the nature of \*\*\* [the witness'] criminal charges 'in order that it [could] have before it complete information so as to be better able to resolve the bias question.' [Citations.]" (*Reese*, 121 Ill. App. 3d at 988, 460 N.E.2d at 453.)

Similarly, in the present case, the jury was entitled to know about Perkins' battery charge and the State's agreement to strike with leave to reinstate that charge. By prohibiting defendant from bringing this out on cross-examination, the trial court deprived defendant of his right to confront a witness against him.

 ██ Not all erroneous rulings limiting cross-examination for bias, however, are deemed harmful. (*People v. Reese* (1984), 121 Ill. App. 3d 977, 988, 460 N.E.2d 446, 453-54.) The factors to be considered in determining whether an error of this nature is harmless beyond a reasonable doubt include " 'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' [Citations.]" (*People v. Young* (1989), 128 Ill. 2d 1, 44, 538 N.E.2d 453, 470.) In considering these factors in the present case, we must be cognizant of the fact that the State's proof included defendant's confession. The existence of the confession is what distinguishes this case from *People v. Triplett* (1985), 108 Ill. 2d 463, 485 N.E.2d 9, *People v. Barr* (1972), 51 Ill. 2d 50, 280 N.E.2d 708, *People v. Robinson* (1987), 163 Ill. App. 3d 754, 516 N.E.2d 1292, and *People v. Foley* (1982), 109 Ill. App. 3d 1010, 441 N.E.2d 655, cited by defendant to support his argument that the error was reversible. In each of those cases, the trial court's improper limitation of cross-examination of a key witness was deemed reversible error but the proof in these cases did not include a confession by the defendant. Where, as here, a confession is present, the error would be harmless, provided the confession withstands the fourth amendment objections after remand.

Defendant next contends that the trial court committed reversible error when it did not permit him to cross-examine Yuksel Konakci, an expert in forensic pathology, concerning a possible explanation for the trajectory of the bullets which struck the murder victim, Robert Morrison. On direct examination, Konakci testified that he could determine from his examination of Morrison's body that two bullets entered from the back and travelled upward, but that he could not tell in which direction the gun was pointed before the bullets struck the

body. He did state, however, that the initial paths of the bullets "maybe" were altered when the bullets hit the ribs of the victim. On cross-examination, defense counsel asked Konakci if another possible explanation for the upward trajectory of the bullets was that the gun was pointed in an upward direction, but the trial court sustained the State's objection on grounds that it was speculation. Defendant argues that the court's ruling was reversible error because it prevented him from obtaining evidence which would have contradicted Julius Perkins' testimony that both defendant and Robert Morrison were on the fourth-floor landing when defendant shot him. The State argues that the trial court's ruling was correct because Konakci was not qualified to testify on the subject.

We find that the trial court did improperly limit defendant's cross-examination of Konakci. Once the court had permitted the State to elicit testimony from Konakci that the initial paths of the bullets could have been altered by the victim's ribs, it then should have permitted defendant an equal opportunity to elicit an alternate theory to account for the direction of the bullets. Though the State argues that Konakci was not qualified to testify as to the position of the gun at the time of the shooting, we find no satisfactory basis for distinguishing between his ability to testify to the one theory of why the bullets travelled in upward paths and not the other.

Nonetheless, we find this error in restricting cross-examination of Konakci to be harmless because the defense was able to elicit Konakci's view that the trajectory of the bullets indicated that the gun was pointed upward through the trial testimony of Officer Kajari. Moreover, defendant was permitted to argue this explanation for the trajectory of the bullets as well as its ramifications to the jury in his summation. Thus, Konakci's view as to the possible location of the gun was before the jury when it rendered its verdict in this case.

Defendant next contends that the trial court committed reversible error when it ruled that he could not cross-examine Assistant State's Attorney Velcich about an exculpatory statement which he had given to the police when he first arrived at the police station on July 29. On direct examination, Velcich testified that on July 31, defendant made a court-reported statement confessing to the killing of Robert Morrison. He further testified that defendant did not complain of mistreatment. The statement, which was introduced into evidence through Velcich, included defendant's assertion that he had previously told different stories of "what had happened" to the police. On cross-examination, defendant attempted to ask Velcich about his earlier exculpatory statement but the trial court sustained the State's hearsay

objection to the question. We find that the statement was properly excluded by the trial court.

 ■ Generally, a defendant's out-of-court exculpatory statement is inadmissible hearsay because its relevance depends upon the truth of the matter asserted or the declarant's belief in the truth or falsity of the matter asserted. (*People v. Westefer* (1988), 169 Ill. App. 3d 59, 63, 522 N.E.2d 1381, 1384.) Defendant, however, argues that the statement was not hearsay because he was seeking to introduce the statement to aid the jury in assessing the voluntariness of his subsequent confession. Even if this were the purpose for its introduction, the probative value of an earlier exculpatory statement on the question of the voluntariness of a later confession would appear to be, at best, too remote and tenuous. In any event, the jury was adequately apprised of both the fact and content of this prior exculpatory statement. As indicated, defendant's written confession included an explicit reference to the fact that he previously had given a different story to the police. Moreover, defendant himself testified at trial that he initially denied the shooting and told the police that he was at home asleep when the shooting occurred.

Defendant's next contention is that the trial court committed prejudicial error when it allowed the jury to deliberate with a photograph of the victim, before the shooting, seated alongside his mother and an unidentified male. He argues that although the photograph was ostensibly introduced as proof of life and death, its only purpose was to evoke the jury's sympathy for the victim. Under the circumstances of this case, we find no error on this point.

 The admission of a photograph is a matter left to the sound discretion of the trial court and should not be reversed on appeal absent an abuse which is prejudicial. (See *People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6.) The State introduced the photograph in question as proof of life and death, an element of its case against defendant. The admission of a photograph which is relevant to establish any fact in issue is proper. (*People v. Henenberg* (1973), 55 Ill. 2d 5, 13-14, 302 N.E.2d 27, 31.) Furthermore, though it would have been preferable for the State to first crop out the victim's mother from the photograph before it was submitted to the jury (see *People v. Bunch* (1987), 159 Ill. App. 3d 494, 511-12, 512 N.E.2d 748, 760), we find that any potential for harm as a result of not doing so was substantially alleviated by the fact that the victim's mother testified at trial as a life and death witness. Under such circumstances, we find the trial court's decision to be within the bounds of the permitted latitude of its discretion.

Defendant's final contention is that the State made several improper, prejudicial remarks during closing argument. In particular, he argues that the State improperly: (1) stated that Assistant State's Attorney Velcich would not put his law license on the line by falsely testifying that defendant's statement was voluntary and accurate, and (2) argued a fact not in evidence when it stated that the parties had stipulated that defendant voluntarily went to the police station.

■■ Generally, although the State is permitted wide latitude in its closing arguments (*People v. Burns* (1988), 171 Ill. App. 3d 178, 187, 524 N.E.2d 1164, 1171), its remarks must be based on the evidence and reasonable inferences drawn from the evidence. (*People v. Cox* (1990), 197 Ill. App. 3d 1028, 1041, 557 N.E.2d 288, 297.) We find that the complained-of remarks in the present case were properly based on the evidence or inferences therefrom.

The State's alleged improper remarks concerning Assistant State's Attorney Velcich were:

> "Now you heard the testimony of Mr. Velcich. Judge his credibility. Is he going to come in here risking his law license risking whatever other possible penalties to put a bad rap on the defendant, Charles Young? I submit not ladies and gentlemen."

Defendant argues that by these statements, the State was improperly placing the weight of its office behind the credibility of Velcich. We cannot agree. The argument defendant makes is similar to one made by the defendant in *People v. Cox* (1990), 197 Ill. App. 3d 1028, 557 N.E.2d 288. In *Cox*, the defendant argued that the State had improperly used the weight of the State's Attorney's office to bolster the credibility of its witnesses when it commented that it took offense at defendant's earlier argument that an assistant State's Attorney and a police detective would risk their jobs by lying on the witness stand. Finding that the State's comments in support of the witnesses' credibility were based on facts in evidence, we found no prejudicial error in the argument. Similarly, the State's remarks in the present case were in response to defendant's testimony contradicting Velcich's testimony about the circumstances of his confession and were based on various facts in evidence, including Velcich's employment, experience, and involvement in the case. Therefore, we find no prejudicial error in these remarks.

■■ Finally, defendant's contention that the State argued a fact not in evidence in its summation centers upon the State's assertion in its summation that the parties stipulated that defendant voluntarily came into the police station at about 10 p.m. on July 29, 1984. We find no harmful prejudice in that assertion since, if anything, the fact

that defendant would have come to the police voluntarily would be suggestive of his innocence. Furthermore, to the extent that this stipulation would have any impact upon a determination of the legality of defendant's arrest, it would not be damaging to defendant since we have already ruled the arrest was illegal. Moreover, there is ample testimony in the record aside from any stipulation to establish that defendant's approach and entry into the police vehicle was voluntary.

We have considered all other arguments made by defendant but find no merit in any of them.

For the reasons stated in Part I of this opinion, the judgment of the trial court is vacated and the cause is remanded for a hearing solely on the issue of whether defendant's statements should be suppressed as fruit of his illegal arrest. If the trial court finds that the statements should be suppressed, we direct the court to conduct a new trial. If, however, the trial court finds to the contrary, we direct the court to reinstate its original judgment, with the exception that it should modify defendant's sentence to reflect a full credit against the Violent Crime Victims Assistance Act fine.

Vacated and remanded with directions.

COCCIA, P.J., and MURRAY, J., concur.