THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ANTHONY NIGHTENGALE, Defendant-Appellant.

First District (3rd Division) No. 80—807

Opinion filed April 13, 1988.

Jeffrey B. Steinback and Thomas A. Corfman, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and Allan Goldenberg, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Following a jury trial, defendant Anthony Nightengale was convicted of attempted murder, aggravated battery and attempted armed robbery. Defendant was sentenced to 40 years in the Illinois Department of Corrections. On appeal, defendant argues that: (1) evidence of defendant's flight and possession of bullets when arrested was unfairly prejudicial; (2) the identification testimony of one witness was vague and did not establish guilt beyond a reasonable doubt; (3) the trial court erred in not granting defendant's motion to suppress identification testimony because defendant's lineup was blatantly suggestive in that defendant was forced to wear jail clothing in that lineup; (4) the prosecutor used inflammatory language and made racial statements which prejudiced defendant's right to a fair trial; (5) the prosecutor used peremptory challenges to systematically exclude blacks from the jury; (6) the trial judge erred in informing the venire panel of defendant's custodial status and in allowing the deputy sheriff to sit close to the defense table; and (7) the trial judge's threats of contempt sanctions against defense counsel deprived defendant of effective assistance of counsel. We reverse and remand for a new trial.

On October 18, 1978, Marko Hainovic was working in the toolroom of his place of employment at 222 E. Pearson Street, Chicago. Hainovic was the maintenance man for the 222 E. Pearson Street building. While at work, Hainovic saw Ted Flammer, the doorman for the building, come down the stairs followed by another man. The man behind Flammer had a gun pointed towards Flammer's back. This man pushed Flammer into the toolroom, placed the gun to the back of Hainovic's head and asked him for money. When Hainovic informed the man that he had no money, the man shot Hainovic in the back. Hainovic then ran to the stairs but the man shot him again in the buttocks and in the hand. Hainovic made it out of the building, ran to the corner of DeWitt and Pearson and collapsed. Hainovic was found lying at that corner by Chicago police officer Tim Brophy, who responded to a disturbance call.

Approximately 12 days later, on October 30, 1978, defendant was walking down South Calumet Street when he was stopped by Officer Darryl White and his partner. Officer White told defendant to get into the car and come to the police station with them for a "name check." Defendant refused to get into the car, drew a pistol from his pants, pointed it at the officers and ran. Defendant was subsequently arrested a few blocks away. While searching defendant, the police recovered the pistol he had drawn on the officers and a brown leather pouch which contained 23 bullets. Defendant was then taken to the

police station and charged with unlawful use of weapons.

On the morning of January 3, 1979, while still in custody on the unlawful use of weapons charge, defendant was removed from his cell at the Cook County jail and placed in a lineup at the 2452 West Belmont Avenue police station. Defendant was dressed in the standard prison uniform shirt and pants, which were marked "DOC" (Department of Corrections). Before leaving the jail, defendant requested street clothes, but prison personnel could not locate defendant's civilian clothes. When defendant arrived at the station, he requested that his attorney be contacted. Defendant also asked to speak with a public defender. Defendant was then placed in a lineup with four other men for Hainovic's viewing. Defendant was the only person in the lineup wearing prison clothes, and the "DOC" letters were visible to Hainovic. Defendant was also the only individual wearing a bracelet on his right wrist which inmates at the Cook County jail are required to wear. Upon viewing the lineup, Hainovic identified defendant as the man who shot him on October 18, 1978.

At trial, defendant was represented by private counsel. On January 22, 1980, defendant's attorney appeared on behalf of his partner and informed the judge that his partner was otherwise engaged. Defense counsel then stated that he would try the case if the court would grant him a continuance of a couple of days for preparation. The court granted counsel a continuance of one day. Defense counsel filed his appearance and additional pretrial motions, including a motion to suppress identification testimony, on January 23, 1980. The trial judge granted counsel leave to file the suppression motion, but stated that he felt the motion was without merit and "in the nature of a dilatory tactic."

On January 24, 1980, during jury selection, the trial judge informed the venire panel that defendant did not appear in court because there were some problems at the jail and defendant was in custody. Defense counsel objected to the trial court's statement and on January 25, 1980, counsel moved to have the venire panel dismissed. The judge denied counsel's motion to suppress and again advised counsel that, in the court's opinion, the motion was made merely for purposes of delay. Defense counsel requested a one-day continuance to research the issue, but the judge granted him only 30 minutes. According to the record, the assistant State's Attorneys openly laughed at defense counsel's argument and request for continuance. Following the 30-minute recess, counsel presented his authority in support of his argument. After a heated discussion between defense counsel and the trial court, counsel's motion to dismiss the jury venire was denied.

The judge then threatened to hold counsel in contempt.

Thereafter, on January 28, 1980, during jury selection, defense counsel moved to prevent the State from using its peremptory challenges to systematically exclude blacks from the jury. This motion was denied. After the State had excluded five of the six prospective blacks from the jury, defense counsel renewed his motion. After denying counsel's motion, the trial court accused counsel of lying and threatened to cite him for contempt. Due to the conflicts between defense counsel and the judge, defense counsel then requested leave to withdraw from the case. This request was denied and trial began the following day.

At trial, the judge admonished defense counsel several times with a contempt citation. After approximately three contempt warnings, the trial court found defense counsel in contempt of court in a sidebar conference. This contempt citation followed the denial of defense counsel's objection to a State's question. Although defense counsel made repeated requests to withdraw as defendant's counsel because he believed the impending contempt sanctions interfered with his ability to vigorously represent his client, the court informed defense counsel that he would be subject to substantial sanctions if defense counsel persisted in his request for leave to withdraw as counsel. Defense counsel then moved for a mistrial, which was denied.

During the repeated disagreements between defense counsel and the judge, the record reflects open mockery by the assistant State's Attorneys of defense counsels attempts to adequately and vigorously represent his client. In closing argument, an assistant State's Attorney alluded to the fact that fingerprints may have been taken when none were introduced. Defendant was then characterized as "a debased animal" and "scum" who committed a crime in "our streets" and not in "some ghetto." After deliberation, the jury returned with a verdict of guilty on all charges. This appeal followed.

Defendant first argues that the admission of evidence of defendant's flight and possession of bullets when arrested was unfairly prejudicial. We disagree.

■■ ■ Evidence of flight is admissible as a fact from which the jury may infer consciousness of guilt. (*People v. Miscichowski* (1986), 143 Ill. App. 3d 646, 656, 493 N.E.2d 135, 139; *People v. Griffiths* (1983), 112 Ill. App. 3d 322, 328, 445 N.E.2d 521, 527.) Moreover, as a general rule, physical evidence is admissible provided there is proof to connect it with a defendant and with the crime charged. (*People v. Free* (1983), 94 Ill. 2d 378, 415-16, 447 N.E.2d 218, 236.) It is not necessary that the object actually be used in committing the offense, just

that the object is at least suitable for the commission of the offense. (*People v. Givens* (1985), 135 Ill. App. 3d 810, 819, 482 N.E.2d 211, 217.) The mere fact that evidence may tend to prejudice a defendant does not render that evidence *per se* inadmissible. The issue is whether the prejudice to the defendant is outweighed by the probative value of the evidence.

In this case, the record indicates that defendant was walking down the street when he was stopped by the police and asked to come to the police station for a "name check." Defendant refused, pulled a gun on the police officers and then ran. The probative value of evidence of defendant's flight is that the jury could infer that defendant had something to hide from the police officers because he fled when they simply asked to speak with him and take defendant to the station for a "name check" identification. The probative value of the bullets lies in the fact that the ballistics test run on the gun defendant possessed indicated that it was the gun used to shoot Hainovic, and the bullets defendant possessed when arrested were for that caliber of weapon. Therefore, defendant's argument that this evidence was far more prejudicial than probative must fail.

Next, defendant argues that the identification testimony of one witness, Hainovic, was vague and did not establish defendant's guilt beyond a reasonable doubt. We disagree.

The testimony of one eyewitness is sufficient to support a conviction, provided the viewing of the accused was under such circumstances as would permit a positive identification and the witness is credible. (*People v. Dixon* (1984), 122 Ill. App. 3d 141, 151, 460 N.E.2d 858, 865.) This is so even where the witness' testimony is contradicted by the accused. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 226, 367 N.E.2d 666, 668.) The mere fact that a witness fails to note a particular characteristic or that there are minor discrepancies in a witness' description does not render that identification unreliable and vague. However, the witness must have had an adequate opportunity to observe the defendant so as to permit a positive identification. *People v. Lotts* (1978), 63 Ill. App. 3d 240, 244, 380 N.E.2d 66, 70.

Here, Hainovic's identification of defendant was based upon his viewing of defendant as defendant descended the stairway to the toolroom. Hainovic testified that he was able to observe defendant's face several times during the five minutes in which the incident occurred. Although Hainovic's viewing of defendant was for a relatively short period of time, the length of time a witness observes a defendant is only one factor to be considered. Time is not in itself determinative of whether there has been a positive identification. Hainovic

was able to give the police a description of defendant and identified defendant from a lineup nearly two months after the robbery and shooting. (*People v. Dixon* (1984), 122 Ill. App. 3d 141, 152, 460 N.E.2d 858, 865.) Based upon these facts, it is our opinion that the record supports a finding that the circumstances surrounding the viewing of defendant were sufficient to render a positive identification.

Defendant next argues that the trial court erred in not suppressing Hainovic's identification testimony because the lineup was unduly suggestive in that defendant was forced to wear his jail clothing. We disagree.

■ In *People v. Medley* (1983), 111 Ill. App. 3d 444, 448, 444 N.E.2d 269, 272, this court stated that the defendant's garb, which constituted a pale green shirt and pants similar to that worn by surgeons, hardly constituted identifiable prison garb. This court further indicated that as there was nothing to identify the outfit as jail issued, the situation of the defendant's clothing was not nearly so egregious as defendant argued. Similarly, in this case, defendant appeared in the lineup wearing a white jail T-shirt with "DOC" on it and a blue denim jacket. Defendant also wore brown jail trousers with "DOC" stamped on the trouser leg. Although we do not condone such practices, we do not believe that this was blatantly suggestive or that such clothing constituted identifiable jail clothing. Here, the lineup was neither unnecessarily suggestive nor conducive to irreparable mistaken identification, as defendant was not forced to wear clothing similar to that previously identified by a witness. (See *People v. Lark* (1984), 127 Ill. App. 3d 927, 469 N.E.2d 728; *People v. Franklin* (1974), 22 Ill. App. 3d 775, 317 N.E.2d 611.) To the contrary, there is nothing to indicate beyond the "DOC" letters that defendant's outfit was anything other than ordinary clothing worn by millions of people every day. (*People v. Partee* (1987), 157 Ill. App. 3d 231, 255, 511 N.E.2d 1165, 1180-81.) The brown pants, white T-shirt and denim jacket that defendant wore are not clothing unique to prison institutions. We, therefore, believe that defendant cannot claim that his clothing was equivalent to "identifiable prison clothing." As a result, defendant's argument that his lineup was unduly suggestive must fail.

Defendant next argues that the prosecutor's use of inflammatory language and racial slurs deprived defendant of his right to a fair trial. We agree.

■ Our Illinois Supreme Court has held that a prosecutor's comments cannot be labelled improper if those comments are based upon facts in the record or reasonable inferences drawn from those facts.

(*People v. Bryant* (1983), 94 Ill. 2d 514, 447 N.E.2d 301.) Thus, a prosecutor has wide latitude to comment on the evidence presented, the evils of the crime committed and the results that would occur if a defendant were released. (*People v. Jennings* (1986), 142 Ill. App. 3d 1014, 1025, 492 N.E.2d 600, 606.) However, it is improper for a prosecutor to express his own opinion of a defendant's guilt or to argue facts which are not based on the evidence. (*People v. Monroe* (1977), 66 Ill. 2d 317, 324, 362 N.E.2d 295, 298; *People v. Johnson* (1987), 119 Ill. 2d 119.) Moreover, a prosecutor's argument must be conducted within the bounds of proper courtroom decorum to insure a defendant's entitlement to a fair trial. Therefore, any remarks that would deprive a defendant of a fair trial cannot be permitted if this rule is to be observed. This is true regardless of a defendant's guilt or innocence. *People v. Savage* (1934), 358 Ill. 518, 522.

Here, an assistant State's Attorney not only argued that defendant's fingerprints were found at the scene of the crime when no fingerprints actually existed, but also attempted to arouse the antagonism of the jury and incite racial prejudice against defendant. In the State's closing argument, the State said:

"THE STATE: *** When you have *** a man who got shot because he kept looking and when you have ballistics, scientific evidence like a fingerprint that's—

DEFENSE ATTORNEY: I will object to that.

THE COURT: The jury is instructed to disregard that last remark with reference to fingerprints.

\* \* \*

THE STATE: That's how I characterize the evidence.

\* \* \*

*** When you have evidence like this and when you have a situation on our streets like we have today where a man can walk into a building, not some ghetto *** but he's got the audacity to walk into a building and take the doorman downstairs and the mechanic *** I say to you that it is the time that we all do our duty and that we return a verdict of guilty as charged in conjunction with the evidence so that we can sweek [*sic*] scum like Anthony Nightengale off the streets.

DEFENSE ATTORNEY: Objection.

THE COURT: Sustained. The jury is instructed to disregard that last remark describing him as scum.

THE STATE: It's borne up by the evidence.

DEFENSE ATTORNEY: Judge, he knows that's improper.

THE COURT: That is improper and I will not tolerate that

\*\*\* that has absolutely no basis with reference to the matter before the Court.

THE STATE: You may each make your own judgments about what you think abut Anthony Nightengale \*\*\*."

Moreover, prior to the State's closing argument, the record indicates that an assistant State's Attorney laughed and smirked while defense counsel argued his objections to the court.

"DEFENSE ATTORNEY: \*\*\* It may be funny to you counsel, but it is serious to me.

\* \* \*

\*\*\* Now again, may the record reflect we're getting these little smiles and little laughs.

THE COURT: I have not made any comment.

DEFENSE ATTORNEY: I don't mean from the Court.

THE STATE: Judge, I reserve the right to smile at side bar.

THE COURT: \*\*\* This is a serious matter, there is nothing to be smiling about. Whether or not you agree with counsel's mode of presenting his defense or any evidence is of no importance."

■ Such conduct by the prosecutor constituted an open mockery of our judicial system and was totally unprofessional. The repeated disregard of the bounds of proper argument and the prosecutor's conduct was so flagrant and purposeful, we can only conclude that it was done for the purpose of prejudicing defendant. Furthermore, we believe the jury may well have been influenced, to defendant's detriment, by the prosecutor's improper remarks. We will not and cannot tolerate such behavior. (*People v. Stock* (1974), 56 Ill. 2d 461, 472, 309 N.E.2d 19, 22-23.) Consequently, we find that defendant is entitled to a new trial.

Defendant's next argument is that the prosecutor used peremptory challenges to systematically exclude blacks from the jury. Based upon the record before us, we agree.

■ In *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, the United States Supreme Curt held that a "defendant does have the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria \*\*\*. Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." (476 U.S. at 85-86, 90 L. Ed. 2d at 80, 106 S. Ct. at 1717.) To this end, a defendant may make a *prima facie* showing of such discrimination based upon a prosecutor's use of peremptory challenges to strike members of a cognizable racial group

from the jury venire. The trial court must consider all relevant circumstances in deciding whether a defendant has in fact established a *prima facie* case of systematic racial discrimination. Once a defendant has made a *prima facie* showing, a prosecutor must provide neutral explanations for his challenges. 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1721.

In *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708, the Supreme Court determined that the holding of *Batson* is applicable to those State convictions pending on direct review at the time the *Batson* decision was rendered.

In this case, the record demonstrates that the venire included six blacks. One of the black venireman was challenged by defendant because he might be partial to the State in that he had been the victim of a shooting, he had two sisters who had been raped and he had a brother who had been robbed. Defendant moved to have this venireman excused for cause, but this request was denied and defendant used a peremptory challenge. After the remaining five black veniremen were peremptorily challenged by the State, defendant immediately moved to discharge the entire panel because of the State's systematic exclusion of blacks from the jury. Defendant's motion to dismiss the venire was denied, and defendant was further denied an opportunity to argue this matter before the trial court. The trial court stated:

"THE COURT: What's your motion?

DEFENSE ATTORNEY: My motion is excuse this panel and send them down for a new panel.

THE COURT: Request denied.

DEFENSE ATTORNEY: May I be heard?

THE COURT: Request denied.

DEFENSE ATTORNEY: May I be heard?

THE COURT: Request denied. Let's go. I want to see you after this is over with."

 As the record indicates, when defendant raised the issue, the trial court denied him the opportunity to set forth facts sufficient to establish a *prima facie* case of systematic exclusion of blacks from the jury. The five blacks who were excluded by the State were, according to the record, well qualified to serve as jurors. Based upon this evidence, we feel that if defendant had been allowed the opportunity to establish his *prima facie* case, defendant would have been successful. The State would then have been required to provide neutral explanations for its challenges. Under these circumstances, we are compelled to find that the State used its peremptory challenges to systematically

exclude blacks from the jury. However, because we are remanding this case for a new trial, we do not order that the trial court conduct a *Batson* hearing. Defendant is to receive a new trial. If defendant exercises his constitutional right to a jury trial, the jury selection process shall be conducted within the mandates of *Batson*.

Because we are remanding this case for a new trial, we need not address the remaining issues raised on appeal. Accordingly, this case is reversed and remanded for a new trial.

Reversed and remanded.

WHITE, P.J., and FREEMAN, J., concur.