THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM SAUNDERS, Defendant-Appellant.

First District (1st Division)   No. 1—89—1476

Opinion filed September 23, 1991.

Randolph N. Stone, Public Defender, of Chicago (Paul D. Bellendir, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Janet C. Mahoney, Special Assistant State's Attorney, and Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, defendant, William Saunders, was convicted of the murder of Robert "Poo" Holloway and sentenced to a prison term of 32 years. On appeal, defendant contends that: (1) the trial court erred in allowing the prior inconsistent statement of his brother to be introduced as substantive evidence; (2) the trial court erred in allowing a police officer to testify as to defendant's unrelated arrest and his involvement in gang activity; (3) the trial court erred in denying defendant's motion *in limine* to bar questions as to his gang affiliation; (4) the trial court erred in denying defendant's request for production of the mugshot books viewed by the State's eyewitness; (5) the trial court erred in denying defendant's motion to suppress identification and in not allowing defense counsel an opportunity to cross-examine the police officer regarding the description he used in putting together the lineup at which defendant was identified; and (6) the State failed to prove him guilty beyond a reasonable doubt. For the following reasons, the judgment of the trial court is affirmed.

The record sets forth the following facts relevant to this appeal. Prior to trial, defendant moved to suppress identification testimony on the ground that the lineup in which the State's key witness, Marvin Marshall, identified defendant had been improperly conducted. At the suppression hearing, Detective Dalponte of the Chicago police department testified that on July 12, 1988, he and his partner, Detective Gene Harris, conducted a lineup at police headquarters. Dalponte picked up Marshall from his home and drove him to police headquarters to view the lineup. No suggestions were made to Marshall as to whom he should pick out from the lineup. In selecting participants for the lineup, Dalponte picked the only four African-American males that were in the lockup at the time and put them and defendant in the lineup room. Dalponte asked each man to step up to the glass, face left, face right, then step back in line. Upon viewing a photo of the lineup at the hearing, Dalponte identified defendant as the first person on the right. Dalponte also stated that defendant had picked that position himself.

On cross-examination, Dalponte stated that the photographs of the lineup had been taken in the hallway outside of the lineup room,

rather than in the actual lineup room. He did not remember the description he had used to gather the lineup participants.

Detective Gene Harris of the Chicago police department then testified that he had told Marshall that there would be five people in the lineup, and there was a possibility that the person he had seen shoot Poo would be there. Harris also stated that defendant had selected his position in the lineup.

On cross-examination, Harris stated that although he and Dalponte had not asked any police station personnel to participate in the lineup, they had called other nearby police stations to see if there were any African-American males in custody. There were not. Defendant was 18 years old; two of the other lineup participants were 20 years old; one was 22 and one was 24. Harris had attempted to physically match the participants in the lineup to defendant, the suspected offender.

Next, defendant testified that when he had entered the lineup room, the other four participants were already in there. He was told to take the first position and to walk up to the one-way mirror. Because defendant had not been wearing a shirt at the time of his arrest, the police gave him a black shirt to wear in the lineup. Defendant claimed that he was the only one in the lineup asked to step forward.

Following the testimony, the trial court denied defendant's motion to suppress the lineup identification, finding that the lineup was not of such a suggestive nature as to lend a strong likelihood of an irreparable misidentification.

At trial, Marvin Marshall, age 17, testified that approximately 1 a.m. on May 29, 1988, he was visiting his friend, Robert "Poo" Holloway at Poo's grandmother's house, when Marshall's aunt, with whom Marshall was staying, asked Marshall to buy some cigarettes for her. Poo agreed to go with Marshall; and the two walked down Washington Street toward a nearby hotel, where they intended to buy the cigarettes from a vending machine. As they were walking, three males walked up to them and started talking to Poo. Marshall did not know any of them. At trial, Marshall identified defendant as one of the three males. Defendant, his two companions, Poo and Marshall then continued walking toward the hotel. Poo was walking in front of Marshall with defendant's two companions, and Marshall was walking behind, next to defendant. While they were walking, defendant kept staring at Marshall's hat, and Marshall observed defendant put a black glove on his right hand. When Poo lit up a marijuana cigarette, defendant moved up next to Poo to share the marijuana. Marshall

stayed behind them. When they arrived at the hotel, one of defendant's companions remained outside, and everyone else went inside. Once inside, defendant took Marshall's hat and put it on himself. Marshall just stared at defendant, but did not say anything. Defendant returned the hat to Marshall and everyone left the hotel.

While walking back toward Poo's grandmother's house, defendant and his two companions dropped back behind Poo and Marshall. Marshall then heard someone say, "Freeze, Poo." Marshall turned around and saw a gunshot spark come from a gun defendant was holding in his gloved hand. Marshall started to run. He assumed Poo had been shot because Poo was not running with him. On direct, Marshall stated that he had heard three shots; during cross-examination, he stated that had heard two or more shots. When Marshall arrived at Poo's grandmother's house, he told Poo's grandmother that Poo had been shot. Subsequently, Marshall viewed two lineups: June 1, 1988, and July 12, 1988. Defendant did not participate in the first lineup. Marshall did not identify anyone at the first lineup, but he did identify defendant in the second lineup.

On cross-examination, Marshall testified that he never saw any photographs taken of the first lineup. He indicated that during the second lineup, each man walked up to the one-way mirror and stepped back, then each man turned to the left and to the right, individually and in unison. Marshall also indicated that prior to the first lineup, he had viewed two mugshot books at police headquarters, but could not identify anyone.

When Marshall mentioned the mugshot books, defense counsel immediately requested a sidebar, and asked for any police reports regarding the mugshot books as well as the mugshot books themselves. In response, the State indicated that this was the first time it had heard about the mugshot books. The court then suggested that defense counsel query Marshall further as to the mugshot books and see "where we go." Upon further questioning, Marshall indicated that he had viewed the mugshot books prior to the first lineup, but had not identified anyone. Defense counsel renewed its request for production of the mugshot books. The court denied the request on the grounds that there was nothing to tie those books to this case. Defense counsel then requested that all testimony regarding the mugshot books be stricken. The State agreed.

Marshall further testified that he was presently incarcerated for attempted robbery, an offense to which he had pled guilty a few weeks earlier. Marshall stated that he had been offered no deal on the

attempted robbery charge in return for his testimony in this case and that his testimony was completely voluntary.

Officer Mike Reyes of the Chicago police department testified that approximately 1:30 a.m. on May 29, 1988, he was in a marked squad car in the vicinity of 2100 W. Washington, Chicago, when he heard approximately five gunshots. Within minutes of hearing the shots, a call came over the police radio that a man had been shot at Hoyne and Washington. He proceeded in that direction, and upon arriving at the scene, Reyes saw an African-American male, approximately 20 years old, lying on the sidewalk, bleeding from the head. Reyes called an ambulance.

Next, Albert Vaughn, defendant's brother, testified. When asked where he had been approximately 7 p.m. on May 28, 1988, Vaughn replied that he did not remember, but that he knew that he had not seen defendant that night. At this point, defense counsel requested a sidebar during which she objected to the State calling Vaughn for the sole purpose of impeaching him with a prior inconsistent statement. In response, the State argued that Vaughn appeared to be a hostile witness in that he was not testifying in accordance with a signed statement he had previously given to the police. The State further argued that because Vaughn's prior signed and acknowledged statement was inconsistent with his testimony at trial, the prior statement could be introduced as substantive evidence. The court overruled defense counsel's objection.

Back in the presence of the jury, Vaughn testified that the entire statement he had given to the police was a lie and that he had been forced to give a statement implicating his brother.

On cross-examination, Vaughn stated that when the police picked him up, they told him that he was being charged with Poo's murder. He was then handcuffed, taken to police headquarters, and put in a small interview room. A homicide detective came into the room and asked Vaughn some questions. When Vaughn denied having anything to do with the murder, the detective punched him in the stomach, and kept punching him every time he denied involvement in the murder.

Another police officer than came into the room and asked Vaughn if he had killed Poo because Poo had belonged to a particular gang. Vaughn said he had not killed Poo. The first detective then hit Vaughn a few more times, grabbed his wrist and pinned it back like he was going to break it. The officer then handcuffed Vaughn to a pole and beat him for 15 to 20 minutes. The officers left for about 15 minutes, returned, and asked the same question. When Vaughn again denied

killing Poo, they started to beat him again. At one point, someone else came into the room, took Vaughn's picture, and left.

The officers again left the room for about 15 minutes. When they returned, they told Vaughn that they knew defendant, not Vaughn, had murdered Poo, and that if Vaughn did not tell them where defendant was or how defendant had killed Poo, they would continue to beat him and would charge him with Poo's murder. When Vaughn did not respond, they continued to beat him for another two to three hours. They also continued to threaten him with a murder charge. As a result, Vaughn made up the statement regarding the events of May 28, 1988.

The statement Vaughn gave to the police set forth the following: On May 28, 1988, approximately 7 p.m., Vaughn saw defendant, whose nicknames are "PeeWee" and "Mr. Soft," in the lobby of the apartment building located at 2145 W. Lake. Defendant was with another man. Vaughn did not know the other man's name, but knew that he was a member of the Black Souls street gang.

Later, approximately 12:30 a.m. on May 29, 1988, Vaughn saw defendant's companion give defendant a gun. Defendant then told Vaughn that he was going to "get" Poo Holloway. Defendant asked Vaughn if he wanted to go with him, but Vaughn did not go. Vaughn then went to his seventh-floor apartment in that building and, while standing in the apartment hallway, heard gunshots fired. Shortly thereafter, defendant and his companion came up to where Vaughn was standing, and the companion told Vaughn that they had "got them." When Vaughn asked who they got, defendant answered, "I got Poo Holloway." At that point, defendant and his companion signalled to a car which had stopped and got into the car. A few minutes later, the police arrived at the scene.

Vaughn further testified at trial that the day after he gave his statement, he stood in a lineup, but was not identified. Later that day, the police dropped Vaughn off at the "projects" and told him that he had a half hour to find defendant. Whether he found defendant or not, he was to return to that spot in a half hour. Vaughn did not find defendant. When he returned to the drop-off spot, he was scared because he thought the police would either beat him or kill him. The police then drove Vaughn back to the police station and told him that he had one day in which to find defendant.

Vaughn stated that what he had told the police and the assistant State's Attorney on May 31 and June 1 was not the truth. He had not seen or talked to defendant on either May 28 or 29. He eventually told the truth to defense counsel in January 1989 because he was

tired of feeling that defendant had been arrested for something that Vaughn did not know he had done. He felt that he had had no choice but to lie to the police in the original statement or be beaten or killed.

On redirect, Vaughn stated that he had been beaten by the police for "hours and hours"; he had been hit in the stomach 300 to 400 times; slapped on the side of the head with a flashlight or walkie-talkie three or four times; and kneed in the groin 20 to 30 times. Although he was "paining," he did not even think about his stomach once he was away from the police. In addition to a swollen stomach and groin, Vaughn allegedly had a small mark on his wrist from where one of the police officers had pinned it back. Vaughn stated that he did not go to the doctor because he was scared. He also did not take any pictures of himself because he did not have a camera, and did not think pictures would do any good.

Next, Maureen Feerick, an assistant State's Attorney, testified that approximately 9 p.m. on June 1, 1988, she interviewed Vaughn at police headquarters. Vaughn was not handcuffed at the time. After Feerick took Vaughn's statement, Vaughn read the statement. Before he signed it, Feerick asked defendant if he had any trouble signing it, and he replied that he did not, and then signed it. While they were alone, Feerick also asked Vaughn if he had any problems that he wanted to discuss. Again, he said that he did not. Feerick stated that Vaughn appeared alert, coherent, cooperative, pleasant and never seemed to be in any physical pain.

Detective John Summerville of the Chicago police department then testified that on the late afternoon of May 31, 1988, he talked to Vaughn at police headquarters. After Vaughn made his statement, Summerville left police headquarters to look for defendant, but could not find him. Summerville then returned to police headquarters and told Vaughn that he was going to continue looking for defendant the next day. Although he was not in custody, Vaughn was willing to wait at police headquarters until the police found defendant. When Summerville returned to police headquarters the next day, Vaughn agreed to participate in a lineup viewed by Marvin Marshall. Marshall did not identify anyone.

Summerville then contacted the assistant State's Attorney and Vaughn's written statement was taken. Vaughn was completely cooperative at all times. Summerville stated that he had never threatened or struck Vaughn and he never saw or heard anyone else do so either.

Officer Ann Chambers of the Chicago police department then testified that on July 11, 1988, approximately midnight, she responded to a call that shots had been fired at 2145 W. Lake. When she arrived at

the scene, she observed a gang disturbance. Defense counsel then objected to the reference to a gang and the court sustained the objection. Chambers further testified that she saw defendant standing on the corner and arrested him.

Defense counsel then requested a sidebar during which she objected to Chambers' testimony regarding defendant's unrelated arrest for shouting gang slogans. The State responded that this witness' testimony was being used to explain how defendant was tied into Poo's murder, to corroborate previous testimony regarding defendant's gang affiliation and to corroborate Vaughn's statement that the police were looking for defendant. The court overruled the objection.

Officer Chambers then stated that she transported defendant to the police station, read him the *Miranda* rights and started to process him by asking him for his name and address. Defendant responded that his name was "Michael Williams." When Officer Chambers questioned whether his name was not really "William Saunders," he denied it. Then Officer Chambers told defendant that she had known his mother before she died, she knew his brother; and she noted the tatoos on his chest (PeeWee) and on his arm (William), and told him that she knew his nicknames were "Baby Soft" and "PeeWee." Defendant then admitted that his name was William Saunders. Because Officer Chambers knew some homicide detectives were looking for William Saunders, she called Area 4 headquarters to inform them that defendant was in custody, and turned defendant over to them.

The State rested its case, and the trial court denied defendant's motion for a directed verdict. Defense counsel then filed two motions *in limine*, which requested that if defendant testified, any information regarding his gang affiliation or juvenile convictions be disallowed. The trial court granted the motion regarding juvenile convictions, but denied the motion regarding gang affiliation.

By stipulation, defense counsel then read into the record Vaughn's January 1989 statement which he had given to defense counsel. The statement contained the following information: One night, people around the project were saying that defendant had been shot. Vaughn went up to the seventh-floor apartment of his girl friend at 2145 W. Lake and, while there, heard gunshots. The next day Vaughn learned that Poo, not defendant, had been shot. Approximately two days later, the police picked up Vaughn, told him that he was being charged with Poo's murder, and took him to police headquarters. After being in the interview room for a few minutes, a homicide detective came and asked him why he had killed Poo. When Vaughn denied killing Poo, the detective threatened to beat him. Some other police

came into the room and started to beat him. At one point, someone else came in and took his picture.

Then, one of the homicide detectives said that he knew defendant, not Vaughn, had killed Poo, and he wanted to know where defendant could be found. When Vaughn told him that he did not know, the officers began to beat him, handcuffed him and beat him again. They then told Vaughn that he better make up a story or they would keep beating him. Finally, Vaughn told them the story about defendant's involvement, inserting facts that the police had already told him. Later, the police officers put Vaughn in a lineup. After the lineup, an assistant State's Attorney came in, handed him a typed statement and asked him if that was what he had told the police. He said "yes." When the assistant State's Attorney left, the police told Vaughn that he "had done good" and they would not hit him anymore.

When the assistant State's Attorney returned with the statement, Vaughn signed it. The police then drove Vaughn to some factories near Western Avenue and told him to see if defendant was in the "projects," and to come back and tell them. Vaughn did as he was told, but was unable to find defendant.

In the January 1989 statement, Vaughn also stated that the June 1988 statement he had given to the police was a lie. Vaughn stated that he had never seen defendant or any members of the Black Souls street gang the night Poo was shot. Moreover, defendant never told Vaughn that he had shot Poo, and Vaughn never saw anyone give defendant a gun. Vaughn further stated that the January 1989 statement was the truth and it was voluntarily given.

Following introduction of the January 1989 statement into evidence, defendant rested his case. Closing arguments ensued, after which the jury returned with a verdict finding defendant guilty of murder. Judgment was entered on the verdict and defendant was sentenced to 32 years in prison. Defendant's timely appeal followed.

Initially, defendant contends that the trial court erred in allowing the State to use Albert Vaughn's prior inconsistent statement as substantive evidence because Vaughn did not have personal knowledge of the events and conditions which were the subject of the statement, as required by section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 115—10.1). In response, the State does not argue that Vaughn had the requisite personal knowledge. Instead, it argues that even if the trial court erred when it admitted Vaughn's statement as substantive evidence, the error was harmless.

Courts have summarized section 115—10.1 by stating that a prior inconsistent statement may be used as substantive evidence: "(1) if it is inconsistent with the witness' trial testimony; (2) the witness is subject to cross-examination at trial; (3) the statement explains an event within the personal knowledge of the witness; and (4) the witness acknowledged at trial that he had made the prior inconsistent statement." (*People v. Coleman* (1989), 187 Ill. App. 3d 541, 547, 543 N.E.2d 555.) The third element is at issue in the present case. "Personal knowledge," as it is used in section 115—10.1, does not refer to knowledge acquired by being told something. It refers to that which has been seen by the witness. *People v. Cooper* (1989), 188 Ill. App. 3d 971, 544 N.E.2d 1273; *People v. Coleman* (1989), 187 Ill. App. 3d 541, 543 N.E.2d 555.

In *Cooper*, the reviewing court held that the witness' statement that "Craig Cooper and Walter Eden told me they had just robbed Travis Vaughn" had been erroneously admitted as substantive evidence because it was based on knowledge gained by a conversation with one of the co-conspirators and not from the witness' perception of the robbery itself. Similarly, in *Coleman*, the reviewing court found prior inconsistent statements of two witnesses to have been improperly admitted because the statements consisted primarily of admissions of defendant which were overheard by the witnesses. The witnesses had not actually observed the subject of the statements.

■■ In the present case, Vaughn's prior inconsistent statement consisted of comments regarding events he had personally observed or personally heard (gunshots) and comments regarding events he learned about through statements made by defendant and by defendant's companion. Vaughn personally observed or personally heard: (1) defendant and another man he knew to be a member of the Black Souls street gang in the lobby of the building at 2145 W. Lake, on Saturday, May 28, 1988, approximately 7 p.m.; (2) early the next morning, approximately 12:30 a.m., Vaughn again saw defendant and his companion; (3) at that time, Vaughn saw the companion hand defendant a gun; (4) defendant told Vaughn that he was going to get Poo Holloway; (5) defendant asked Vaughn if he wanted to go with him; (6) after defendant left, Vaughn heard gunshots fired; (7) approximately 1:30 a.m., defendant and his companion returned to Vaughn's apartment; (8) defendant and his companion signalled to a car which had stopped; (9) defendant and his companion got into the car; and (10) the police arrived. Because all of the preceding events had been personally observed or personally heard by Vaughn, they were admissible as substantive evidence under section 115—10.1. However,

Vaughn had not personally seen or heard the events which were the subject of the following statements made by defendant and his companion to Vaughn: the statement by defendant's companion that they had "got them" and defendant's statement, "I got Poo Holloway." He had merely heard statements about the events. Accordingly, the trial court erred in allowing those portions of the statement to be admitted as substantive evidence.

Although the trial court erred in admitting certain portions of the statement, it was not reversible error. The standard for determining whether error is harmless or reversible is whether it is harmless beyond a reasonable doubt. Error may be harmless if it is in itself inconsequential or if, when balanced against the State's evidence, the State's evidence establishes defendant's guilt beyond a reasonable doubt. (*People v. Cooper* (1989), 188 Ill. App. 3d 971, 544 N.E.2d 1273.) In the present case, in light of the overwhelming evidence of defendant's guilt established by the uncontradicted eyewitness testimony of Marvin Marshall, and corroborated by the admissible portion of the June 1 statement of Albert Vaughn, we conclude that any error was harmless.

Next, defendant argues that the trial court erred in not holding a hearing outside the presence of the jury to determine the voluntariness of Vaughn's prior inconsistent statement. At trial, Vaughn stated that his entire statement to the police was a lie and that he had given the statement so that the police would stop beating him and to avoid being charged with Poo's murder. Three State's witnesses testified to the contrary.

In raising this argument, defendant has failed to cite to any statutory or common law authority that requires the trial court to hold a hearing to determine voluntariness. It is well established that points raised, but not supported by citation to relevant authority, fail to satisfy the requirements of Supreme Court Rule 341(e)(7) and are, therefore, waived for review. (*People v. Felella* (1989), 131 Ill. 2d 525, 546 N.E.2d 492.) Further, we note that the record does not indicate that defendant ever requested such a hearing.

Defendant next argues that the trial court erred in allowing the State to use Vaughn's prior inconsistent statement when that statement had been made involuntarily. The test for voluntariness is whether the statement was made freely and without compulsion or inducement of any sort. (*People v. Haymer* (1987), 154 Ill. App. 3d 760, 506 N.E.2d 1378.) The court looks to the totality of circumstances to see if the statement had been voluntarily given. The trial court need not be convinced beyond a reasonable doubt, but the State must show

by a preponderance of the evidence that the statement was made without any compulsion of any sort. The finding of the trial court that the statement was voluntary will not be disturbed on review unless it is contrary to the manifest weight of the evidence. *People v. Hattery* (1989), 183 Ill. App. 3d 785, 539 N.E.2d 368.

■■ In the present case, defendant contends that Vaughn's statement was extracted after 29 hours of intermittent interrogation, threats and physical abuse. As previously discussed, Vaughn testified that on May 31, 1988, he was taken to police headquarters in handcuffs and was told that he was a suspect in the murder of Poo Holloway. Once at the station, Detective Summerville read him his *Miranda* rights. Vaughn stated that he was placed in an interrogation room and beaten and threatened until he finally gave a statement implicating defendant.

In contradiction to Vaughn's testimony, Detective Summerville testified that although he had read Vaughn his *Miranda* rights, he also had told Vaughn that he did not know if Vaughn was involved or not. After Vaughn's statement, Summerville left the station to look for defendant. When he could not find him, he returned to the station. According to Summerville, Vaughn was willing to remain at the station until they found defendant. Summerville said Vaughn was cooperative the entire time and even agreed to participate in a lineup on June 1. Summerville denied hitting or threatening Vaughn and never saw or heard anyone else do so. Summerville further stated that Vaughn was never in custody or under arrest.

Maureen Feerick, assistant State's Attorney, testified that when Vaughn gave her his statement on the evening of June 1, he was cooperative, alert, coherent, pleasant and in no apparent physical pain. When she was alone with him, she had asked him if he had any trouble signing the statement and he had said, "No."

Based on the testimony of Detective Summerville and Assistant State's Attorney Feerick, we find that the State has met its burden of proof as to the voluntariness of Vaughn's statement. Moreover, we note that after the alleged physical abuse Vaughn had received from the police, it is likely that there would have been some level of discomfort visible to Feerick, who had interviewed defendant shortly after the police had questioned him. Yet, she saw nothing and, in fact, found Vaughn to be very pleasant and not in any pain. Accordingly, we find that the trial court's determination as to the voluntariness of Vaughn's statement was not contrary to the manifest weight of the evidence.

Next, defendant contends that the trial court erred in allowing Officer Chambers to testify about defendant's unrelated arrest and his involvement in gang activity. Defendant contends that Officer Chambers' testimony regarding his arrest for an unrelated crime was prejudicial because it admitted evidence of other crimes and it imputed gang activity to defendant. The State responds that Officer Chambers' testimony was relevant and admissible because it revealed facts and circumstances leading to defendant's arrest and it presented evidence of defendant's consciousness of guilt. The State further argues that any error resulting from Officer Chambers' reference to a gang disturbance was cured when the court promptly sustained defendant's objection.

For purposes of review, evidentiary rulings of this kind will not be reversed on appeal unless a clear abuse of discretion has been shown. (*People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183.) At trial, Officer Chambers testified that on July 11, 1988, approximately midnight, she responded to a call over the police radio that shots had been fired at 2145 W. Lake. When she arrived at the location, she noticed that a gang disturbance was in progress. At this point, defense counsel objected and the trial court sustained the objection. Officer Chambers then testified that she arrested defendant at the scene of the gang disturbance. Defense counsel objected to the introduction of evidence of an unrelated arrest. The trial court overruled the objection. Officer Chambers then stated that she transported defendant to the police station, read him the *Miranda* rights and started to process him by asking his name and address. Defendant responded that his name was "Michael Williams." When Officer Chambers questioned whether his name was not really William Saunders, he denied it. Then Officer Chambers told defendant that she had known his mother before she died; she knew his brother; and she noted the tatoos on his chest (PeeWee) and on his arm (William), and told him that she knew his nicknames were "Baby Soft" and "PeeWee." Defendant then admitted that his name was William Saunders. Because Officer Chambers knew some homicide detectives were looking for William Saunders, she called them and turned defendant over to them.

■ First, contrary to defendant's position, Officer Chambers' testimony that she had arrested defendant on a charge unrelated to Poo's murder was admissible as part of the narrative describing the events leading up to defendant's identification and arrest. (*People v. Gonzalez* (1991), 142 Ill. 2d 481, 568 N.E.2d 864.) Second, regarding Officer Chambers' reference to "a gang-related disturbance," gang-related evidence is admissible if it is relevant to an issue in dispute and

its probative value outweighs its prejudicial effect. Relevant evidence is that which has a tendency to make the existence of a fact that is of consequence to the action more or less probable than it would be without the evidence. (*People v. Gonzalez* (1991), 142 Ill. 2d 481, 568 N.E.2d 864.) In *Gonzalez*, the victim's identification of the offender was the key issue. Because the victim's recognition of defendant as a member of a particular gang strengthened his identification testimony, the supreme court found mention of gang membership to be relevant.

In the present case, the mention of a gang disturbance corroborates Albert Vaughn's testimony that when he was being questioned at police headquarters, the homicide detective had asked him if Poo had been shot because of his rival gang affiliation, and that the person he had seen give defendant a gun shortly before Poo's murder was a member of the Black Souls street gang. Accordingly, the trial court properly allowed Officer Chambers to testify as to the gang disturbance. For the same reasons, we find that the trial court properly denied defendant's motion *in limine* to avoid mention of gang affiliation if he should testify.

Defendant further argues that he was also prejudiced when the State inserted its "speculative gang theory" into closing argument. Acknowledging that his objection had been sustained, defendant argues that the remark highlighted the State's efforts to prejudice defendant by inserting evidence of gang memberships when there was no evidence to support the claim.

As a general rule, great latitude is afforded a prosecutor during closing argument, and the propriety of the prosecutor's remarks is within the discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. (*People v. Trask* (1988), 167 Ill. App. 3d 694, 521 N.E.2d 1222.) Further, a prosecutor may base his closing argument both on the proof adduced at trial and on any reasonable inferences that flow from that truth. *People v. Escobedo* (1986), 151 Ill. App. 3d 69, 502 N.E.2d 1263.

In the present case, the State made the following comment during closing argument:

"[STATE]: A motive to kill. The State does not have to provide a motive for why anybody does anything. A lot of times, we're never to find out. But I could submit to you a—what a motive was. Maybe there is rival gang problems here, maybe the victim, Robert Holloway fell into disfavor.

[DEFENSE]: Objection, she is asking him to speculate.

THE COURT: Sustained.

[STATE]: You think about it. You heard the testimony.

> I don't know why William Sanders [*sic*] killed Poo Holloway.
> I can't say that. I don't have to establish a motive. What I do
> have to show you is [*sic*] the acts, and an identification. You
> have the identification, you have that by Marvin Marshall. You
> will also have intent.''

The State's comments were properly made as inferences from the evidence of gang affiliation introduced during Vaughn's direct testimony and his testimony on cross-examination. However, even if the State's comments were found to be erroneous, defendant has failed to show that the verdict would have been otherwise if the remarks had not been made. (*People v. Lasley* (1987), 158 Ill. App. 3d 614, 511 N.E.2d 661.) Therefore, in light of the uncontradicted testimony of Marvin Marshall, corroborated by the admissible portions of Vaughn's statement, we find the comments do not provide grounds for reversal.

Next, defendant contends that the trial court erred in denying his request for the production of the mugshot books viewed by Marvin Marshall prior to the first lineup. Defendant argues that the trial court's denial of his request to view the mugshot books was not harmless because identification was a key issue; Marshall's character for veracity was questionable in light of his recent conviction of attempted robbery; and Marshall had a motive to identify defendant because defendant had tried on Marshall's hat.

During cross-examination, Marshall indicated that prior to viewing the first lineup on June 1, 1988, he had been shown "a lot of pictures" by the police. Surprised by this information, defense counsel requested a sidebar during which she stated that none of the police reports had indicated that Marshall had viewed mugshot books prior to the lineup. In response, the State indicated that it had no prior knowledge of Marshall having looked at any mugshot books either. The State further argued that defense counsel knew Marshall was going to be called as a witness and had had ample opportunity to interview him prior to trial. The court then allowed defense counsel to query Marshall further about the mugshot books. Thereafter, out of the presence of the jury, Marshall stated that he had viewed two mugshot books prior to the first lineup, but had not been able to identify anyone. When defense counsel requested the production of the books, the State replied that there was not any basis for such a request because no identification had been made. In response, defense counsel stated, "Judge, for all I know, William Sanders' [*sic*] picture was in that book." The trial court denied defense counsel's request on the ground that there was nothing to tie any of those books to the case. After the court's ruling, the following colloquy ensued:

"[DEFENSE]: Judge, I would—I do not intend to question Mr. Marshall concerning this and I would ask, since this book hasn't been produced, and wasn't indicated in any reports that the State also be precluded in that. In fact, all testimony be stricken.

THE COURT: Fine, I don't have any objection to that.

Do you have any problem with that? State, do you have any problem with that?

[STATE]: No. She is referring to the witness' reference to looking at mug books, I have no problem with that.

THE COURT: Very good."

Supreme Court Rule 412(c) (134 Ill. 2d R. 412(c)) provides:

"[T]he State shall disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor."

In the present case, not only did the State not have possession or control of the mugshot books, it did not even know that Marshall had viewed mugshot books. Further, the mugshot books were not material. Evidence is material only if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. It is not enough that the evidence might have helped the defense. *People v. Chambers* (1990), 200 Ill. App. 3d 538, 558 N.E.2d 274.

In *Chambers*, defendant was convicted of the murder and attempted robbery of two Chicago Transit Authority passengers on July 2, 1985. Several eyewitnesses identified defendant as the assailant. One of the eyewitnesses, Lavador Williams, viewed a lineup on July 6, 1985, and identified defendant. Another witness, Gail Lofton, viewed several mugshot books on July 3, pointed to one picture which "looked like" defendant, but failed to make a positive identification. Later that day, Lofton viewed a lineup in which defendant did not participate and made no identification. On November 6, 1986, Lofton was shown a photograph of the July 6, 1985, lineup in which defendant participated, and identified defendant. Two additional witnesses, Brenda Gaines and her 11-year-old daughter, Todja, viewed mugshot books on July 3, 1985, and did not identify anyone. Then, on July 6, 1985, they separately viewed a lineup and identified defendant.

On appeal, defendant contended, *inter alia*, that the trial court had erred in denying his motion for a mistrial after Lofton testified that she had viewed mugshot books which contained a photograph of someone who "looked like" the shooter, and that photograph was not

made available to him. It was unknown whether defendant's photograph was in the mugshot books viewed by Lofton. The reviewing court noted that if the mugshot books had contained a photograph of defendant, he might have used the books to attempt to show the failure to identify him by Lofton, Brenda Gaines and Todja Gaines. Defendant might also have used the photograph which allegedly "looked like" him to show that it did not resemble him. However, the *Chambers* court concluded that such attempts would carry little weight in light of the witness' positive identification of defendant. Thus, the court concluded that even if the photograph might have helped defendant in some vague, speculative way, it was not material because it would not have altered the outcome of the trial.

In the present case, although there was only one eyewitness, he positively identified defendant as the shooter at both the lineup and in court. The testimony of one credible eyewitness may support a conviction if he viewed defendant under circumstances affording an adequate opportunity to observe defendant and to permit a positive identification. (*People v. Nightengale* (1988), 168 Ill. App. 3d 968, 523 N.E.2d 136.) Therefore, because the mugshot books would not have altered the outcome of the trial, they were not material, and the trial court properly denied defendant's request for production of the mugshot books.

Next, defendant contends that the trial court erred in denying his motion to suppress identification and in not allowing defense counsel an opportunity to cross-examine Officer Harris regarding the description he had used in putting together the July 12, 1988, lineup. Defendant further argues that the July 12, 1988, lineup was unnecessarily suggestive because of the physical size, clothing and complexion differences of the participants; because of Officer Harris' comments to Marvin Marshall prior to his viewing the lineup; and because of the lack of photographic evidence depicting the actual lineup. In raising this issue, the burden is on defendant to establish that, within the totality of circumstances, the lineup was unnecessarily suggestive and conducive to irreparable mistaken identification. *People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612.

■ Regarding the alleged differences in the physical appearance of the lineup participants, defendant argues that he was the youngest, shortest, the slightest built, and the only one wearing a black shirt given to him by the police. Any complaint that there were differences between defendant's appearance and that of the other lineup participants goes to the weight of the evidence, not to its admissibility. (*People v. Trass* (1985), 136 Ill. App. 3d 455, 483 N.E.2d 567.) It is the

trier of fact's function to determine the weight to be given to testimony, and the trial court's ruling on a motion to suppress will not be set aside unless it is clearly erroneous. (*People v. Trask* (1988), 167 Ill. App. 3d 694, 521 N.E.2d 1222.) Substantial differences in the age and appearance between the suspect and the other participants in a lineup do not, in themselves, establish that a lineup was unnecessarily suggestive. *People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612 (defendant was only lineup participant who had an "Afro" hair style); *People v. Trass* (1985), 136 Ill. App. 3d 455, 483 N.E.2d 567 (defendant was only lineup participant with braided hair); *People v. Johnson* (1982), 104 Ill. App. 3d 572, 432 N.E.2d 1232 (defendant was the only bald and bearded lineup participant).

In the present case, defendant, an African-American male, age 18, was put in a lineup with four other African-American males, ages 24, 20, 22 and 20. Two of the men were wearing shorts as was defendant, two had mustaches, all were wearing different types of shirts or jackets, and they were of varying heights and builds. In light of the fact that participants in a lineup do not have to be physically identical (*People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612), defendant has failed to show how the appearance of the participants was unduly suggestive. Defendant places a great deal of emphasis on the fact that the police had given him a black shirt to wear at the lineup. However, he fails to show how that shirt made his identification more likely. Based on the general physical differences among the lineup participants, we do not find that the lineup was unduly suggestive. Further, we find those cases relied upon by defendant where physical distinctions were held to be suggestive are distinguishable from the present situation. *Israel v. Odom* (7th Cir. 1975), 521 F.2d 1370 (the victim described her assailant as wearing glasses; defendant was the only lineup participant wearing glasses); *People v. Morris* (1970), 131 Ill. App. 2d 443, 266 N.E.2d 444 (victim described assailant as approximately 17 years old with a "sloped" face; defendant was placed in a lineup with two adults, one of whom had a mustache, the other had a round face).

■ Defendant next argues that he was prejudiced by the trial court's failure to let him cross-examine the police officers who had put together the lineup as to the description they had used in picking participants. However, the record indicates that defendant was given that opportunity, but the officer could not remember the description.

"[DEFENSE COUNSEL]: Now, in making up this lineup, you also used the descriptions of the people, is that correct? The descriptions of the offenders?

[DETECTIVE DALPONTE]: Yes.

Q. And in this case there were—the descriptions you were using, do you remember what that was?

A. No, I don't recall right now.

Q. Were you using a description of someone 20 years of age, 5,6 to 5,8 [*sic*]?

A. Possibly, I don't recall what the description of the—was at the time.

Q. You also [were] using the description of someone 130 to 140 pounds?

[STATE]: Objection, Judge. Officer has already indicated, he doesn't recall.

THE COURT: Sustained."

Further, during direct, Detective Gene Harris, the police officer who put the lineup together, testified that they had used the only four African-American males available in the lockup at the time of the lineup. Although the police attempted to find other lineup participants from other lockups, none were available. During cross-examination, defense counsel further queried Harris as to the description used to locate lineup participants:

"[DEFENSE COUNSEL]: Now, detective, so it is your testimony that—did you, detective, review any of the descriptions of the offenders?

[STATE]: Objection.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Detective, it is your testimony then that you made no efforts to insure that the other people in the lineup matched the descriptions of the offenders?

[STATE]: Objection.

THE COURT: Sustained.

[DEFENSE COUNSEL]: It was only your objective to try to have them match the person you believed to be the offender, is that correct?

A. Yes.

Q. And you did not, in fact, match those people to descriptions given of the possible offenders in the case, is that correct?

[STATE]: Objection, Judge. I'm objecting on the basis—

THE COURT: Sustained."

It is clear from the foregoing that defense counsel was not foreclosed from examining the detectives, she was simply unable to elicit any more information from them.

■ Defendant also argues that Detective Harris' comment to Marshall prior to Marshall's viewing the lineup was unduly suggestive. Specifically, Detective Harris testified that he told Marshall that there would be five people in the lineup and there was a "possibility" that one of them would be the person he had seen shoot Poo Holloway. In our view, this comment was not unduly suggestive. Harris merely spoke of possibilities, not certainties or probabilities. However, even if Harris had told Marshall that the suspect was in the lineup, Harris would have been merely stating the obvious rather than making unduly suggestive comments. (*People v. Johnson* (1984), 123 Ill. App. 3d 1008, 463 N.E.2d 877.) The case relied upon by defendant, *People v. Boyd* (1974), 22 Ill. App. 3d 1010, 318 N.E.2d 212, is factually inapposite and unpersuasive. In *Boyd*, the complainant identified his attackers as Indians and described the style and color of their outer clothing. Prior to the pretrial identification procedure, a police officer told the complainant that the two suspects were in the reviewing room. Although the two suspects were in the reviewing room with approximately 10 other people, four or five of them were uniformed policemen, the suspects were the only Indians, and they were the only ones wearing clothing similar to that described by the complainant. The reviewing court found that the identification procedure was unduly suggestive. Nevertheless, it also found that an independent origin existed for the identification.

■■ Defendant next argues that the fact he was directed to take the number one position in the lineup further added to its suggestive nature. At the hearing on the motion to suppress, Detectives Dalponte and Harris testified that defendant had selected his position in the lineup. In contradiction to their testimony, defendant testified that he did not have a choice as to the position. Resolution of conflicting evidence is a credibility question, reserved for the trier of fact, and this court will not substitute its own judgment unless the trial court's finding is clearly erroneous. (*People v. Nightengale* (1988), 168 Ill. App. 3d 968, 523 N.E.2d 136.) In our view, the trial court's ruling was not clearly erroneous.

■■ Lastly, defendant argues that the lack of photographs of the actual lineup added to the suggestive nature of the lineup. At the hearing, two photographs of the lineup participants were admitted into evidence. However, testimony revealed that these photographs had been taken in the hallway outside of the lineup room, rather than in the lineup room itself. There is no dispute that the photographs accurately reflected who participated in the lineup and in which order they were lined up. Further, defendant offers no authority to support

his inference that photographs of the lineup must be taken in the lineup room rather than outside. Accordingly, defendant has failed to show how he was prejudiced by the photographs and we find no grounds for reversal.

Next, defendant contends that the State failed to prove him guilty beyond a reasonable doubt because the testimony of the State's key witness, Marvin Marshall, was not credible and was not certain as to the identification of defendant as the shooter. A criminal conviction will not be set aside unless the evidence is so improbable or so unsatisfactory as to raise a reasonable doubt of defendant's guilt. In reviewing a defendant's challenge to the sufficiency of the evidence, the court must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found defendant guilty beyond a reasonable doubt. (*People v. Cruz* (1990), 196 Ill. App. 3d 1047, 554 N.E.2d 598.) The testimony of a single eyewitness is sufficient to support a conviction, provided that the witness is credible and the circumstances were such that would permit a positive identification. (*People v. Nightengale* (1988), 168 Ill. App. 3d 968, 523 N.E.2d 136.) The sufficiency, weight and credibility of the eyewitness' testimony is a determination for the trier of fact. *People v. Jones* (1989), 187 Ill. App. 3d 823, 543 N.E.2d 834.

■ In arguing that Marvin Marshall was not a credible witness, defendant argues that: (1) Marshall had pled guilty to attempted robbery several days before the trial; (2) Marshall's testimony was riddled with improbabilities; and (3) Marshall felt animosity toward defendant. Regarding Marshall's attempted robbery conviction, the jury heard the evidence, and as trier of fact, made a determination as to Marvin Marshall's credibility. Defendant has failed to show that that determination was clearly erroneous so as to warrant reversal. *People v. Nightengale* (1988), 168 Ill. App. 3d 968, 523 N.E.2d 136.

Regarding the alleged "improbabilities" in Marshall's testimony, defendant cites to the following: (1) Marshall had known Poo for over two months, yet did not know Poo's real name; (2) Poo and Marshall did not smoke any marijuana that evening prior to meeting up with defendant; (3) only Poo and defendant smoked marijuana on the way to the hotel; (4) if Marshall had actually seen the spark from the gun, he would have been temporarily blinded and unable to see who had shot the gun; (5) Marshall heard three gunshots, yet Officer Reyes testified that he had heard approximately five gunshots; and (6) Marshall did not know what happened to defendant's companions after the shooting.

In raising these alleged improbabilities, defendant offers no supporting legal authority for his contention that either individually or cumulatively they provide grounds for a reversal. Instead, defendant's entire argument is grounded in probability and speculation which do not support a claim of reversible error. See *People v. Crosser* (1983), 117 Ill. App. 3d 24, 452 N.E.2d 857.

Regarding defendant's claim that Marshall's identification of him was uncertain, the following factors must be considered in evaluating identification testimony: (1) the witness' opportunity to view the defendant at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior identification of defendant; (4) the level of certainty of the witness' identification; and (5) the length of time between the crime and the identification confrontation. (*People v. Cruz* (1990), 196 Ill. App. 3d 1047, 554 N.E.2d 598.) Applying these principles to the facts in the present case indicates that Marshall's identification testimony was sufficient to support a determination of guilt beyond a reasonable doubt.

Marshall was walking next to defendant on a well-lit street for part of the two-block walk to the hotel. While Marshall was next to defendant, he observed defendant put on a black glove. Marshall also stared at defendant as defendant was looking at Marshall's hat on the way to the hotel. Once inside the hotel, defendant took Marshall's hat. Marshall did not say anything, but again stared at defendant. While the group was walking back toward Poo's grandmother's house, defendant and his two companions dropped back behind Poo and Marshall. Marshall then heard someone say, "Freeze, Poo," he turned and saw a gunfire spark shoot out from a gun being held by defendant in his gloved hand. Approximately six weeks later, Marshall identified ˡᵒfendant in a lineup. Based on this testimony, it is clear that Marshall had ample opportunity to view defendant, he saw defendant holding the gun, his identification of defendant was unequivocal and a short period of time had elapsed between the shooting and the lineup identification. Accordingly, based upon the totality of the evidence, we conclude that a rational trier of fact could have found defendant guilty beyond a reasonable doubt. Therefore, the State met its burden of proof.

For the aforementioned reasons, the judgment of the trial court is affirmed.

Affirmed.

MANNING, P.J., and O'CONNOR, J., concur.